# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL-EMILE BERTEAU, for himself and derivatively on behalf of Nominal Defendant TURNING POINT BRANDS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0873-PAF |
| DAVID E. GLAZEK, LAWRENCE S. WEXLER, GREGORY H.A. BAXTER, H.C. CHARLES DIAO, ASHLEY DAVIS FRUSHONE, PEGGY HWAN HEBARD, ARNOLD ZIMMERMAN, STANDARD GENERAL L.P., and STANDARD GENERAL GP LLC, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| TURNING POINT BRANDS, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: March 23, 2021
Date Decided: June 30, 2021

Neal C. Belgam, Robert K. Beste, Michael C. Wagner, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Peter B. Andrews, Craig Springer, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeremy Friedman, David Tejtel, FRIEDMAN, OSTER & TEJTEL, LLP, New York, New York; *Attorneys for Plaintiff Paul-Emile Berteau.*

John M. Seaman, Matthew L. Miller, Christopher F. Cannataro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Defendants Gregory H.A. Baxter, H.C. Charles Diao, David E. Glazek, Lawrence S. Wexler, Arnold Zimmerman, and Nominal Defendant Turning Point Brands, Inc.*

David A. Dorey, Brandon W. McCune, BLANK ROME LLP, Wilmington, Delaware; Barry H. Genkin, BLANK ROME LLP, Philadelphia, Pennsylvania; *Attorneys for Defendants Ashley Davis Frushone and Peggy Hwan Hebard.*

Blake Rohrbacher, Christian C.F. Roberts, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Standard General L.P. and Standard General GP LLC.*

**FIORAVANTI, Vice Chancellor**

This case concerns a controlling stockholder transaction. Standard General, L.P. ("Standard General") was the controller of a publicly traded holding company ("SDI"). SDI held the majority of the common stock of a publicly traded operating company, Turning Point Brands, Inc. ("TPB" or the "Company"). TPB's stock was SDI's only material asset, and TPB's stock traded at a significant premium to that of SDI. To eliminate inefficiencies arising from SDI's existence as an intermediate public company, TPB acquired SDI (the "SDI Buyout"). The SDI Buyout was a forward triangular merger through which TPB paid 0.97 shares of TPB common stock for every TPB share owned by SDI. TPB appointed a Special Committee to negotiate the merger with SDI, but it did not condition the SDI Buyout on a majority-of-the-minority approval by TPB's minority stockholders.

Through his stockholder derivative complaint in this action, Plaintiff alleges that TPB's board of directors breached their fiduciary duties to TPB because the SDI Buyout was not entirely fair to TPB's stockholders. Plaintiff further alleges that Standard General and Standard General GP LLC, Standard General's general partner and controller, breached their fiduciary duties as controlling stockholders by forcing TPB to conduct the SDI Buyout. Defendants have moved to dismiss the complaint under Court of Chancery Rules 12(b)(6) and 23.1.

This Opinion resolves the motions to dismiss.

## I. FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Verified Complaint (the "Complaint" or "Compl.") and the exhibits incorporated by reference therein, including documents that were produced in response to a demand to inspect TPB's corporate books and records pursuant to 8 *Del. C.* § 220.[1]

### A. TPB's Corporate Structure

TPB is a Delaware corporation that develops, manufactures, markets, and distributes nicotine products, smokeless tobacco products, and smoking accessories.[2] In 2016, TPB completed an initial public offering of its common stock, which trades on the New York Stock Exchange under the symbol "TPB."[3]

Standard General is a Delaware limited partnership engaged in the business of managing hedge funds. Defendant Standard General GP LLC ("SGGP") is Standard General's general partner, and non-party Soohyung Kim is Standard

---

[1] The parties agreed that the documents produced to the Plaintiff in response to the 220 demand are incorporated by reference to the Complaint. Director Defs.' Opening Br. 8. In addition, the Complaint incorporates by reference the Form S-4 recommending that SDI's stockholders approve the SDI Buyout (the "Form S-4"). The Form S-4 is attached as Exhibit B to the Special Committee Defendants' Opening Brief, and the Merger Agreement is attached as Annex A to the Form S-4. The Merger Agreement required TPB and SDI to "cooperate and jointly prepare" the Form S-4. Merger Agreement § 5.1(a) (requiring TPB and SDI to cooperate and jointly prepare the Registration Statement); *id.* at A-43 (defining "Registration Statement" as "the registration statement on Form S-4 . . . to be filed with the SEC by TPB").

[2] Compl. ¶ 27.

[3] *Id.*

General's co-founder and managing partner. The Complaint alleges that Kim controls SGGP and that SGGP controls Standard General.[4] This Opinion refers to Standard General and SGGP collectively as the "Standard General Defendants." Plaintiff alleges that Standard General was a "principal stockholder of TPB's pre-IPO predecessor" and that Standard General has controlled TPB "at all relevant times."[5]

According to the Complaint, Standard General acquired SDI, a publicly traded shell company,[6] to hold a controlling stake in TPB. In 2017, Standard General contributed approximately 52% of TPB's stock to SDI in exchange for approximately 89% of SDI's common stock. Standard General also contributed two other assets to SDI, an insurance business ("Maidstone Insurance") and an outdoor advertising business (the "Billboard Business").[7] Standard General and SDI have the same New York City address.[8]

SDI remained as the intermediate holding company for Standard General's TPB stock until the SDI Buyout. Prior to the SDI Buyout, Standard General held a

---

[4] *Id.* ¶ 26.

[5] *Id*. ¶¶ 27, 30.

[6] The shell company was originally named Special Diversified Opportunities, Inc. It later changed its name to Standard Diversified, Inc. For ease of reference, this Opinion uses the term SDI when discussing the entity at all times.

[7] Compl. ¶ 46.

[8] *Compare* Form S-4 at 7, *with id.* at 144.

3

majority stake in SDI, including over 75% of SDI's outstanding, publicly traded Class A common stock and more than 80% of SDI's outstanding Class B super-voting stock, which was not publicly traded.[9]  At that time, SDI held a majority of TPB's common stock, which was SDI's primary asset.

The TPB board of directors comprises the same seven directors both when it approved the SDI Buyout and when Plaintiff filed his complaint:  Defendants David E. Glazek, Gregory H.A. Baxter, Arnold Zimmerman, Lawrence S. Wexler, H.C. Charles Diao, Ashley Davis Frushone, and Peggy Hwan Hebard.  Glazek and Diao joined the TPB board in 2012, and Wexler, Zimmerman, and Baxter joined the board at least two years prior to the 2016 IPO.[10]  Hebard and Frushone were both appointed to the board on September 26, 2018.[11]  Glazek and Zimmerman are two of three members of the TPB board's Compensation Committee, and Glazek serves as its Chairman.[12]

Glazek, Baxter, Zimmerman, Wexler, and Diao are collectively referred to herein as the "Director Defendants."  Glazek is the Chairman of TPB's board of

---

[9] Compl. ¶ 28.

[10] *Id.* ¶ 30.

[11] *Id.* ¶¶ 22-23.

[12] *Id.* ¶ 25.

4

directors.[13]  Glazek is a partner at Standard General,[14] and the Form S-4 discloses that his responsibilities include "helping companies that Standard General controls or influences with operational, transactional, and financing needs."[15]  Glazek was "formerly an investment banker at Lazard Freres & Co., where he focused on mergers and acquisitions and corporate restructurings."[16]

Glazek, Baxter, and Zimmerman were SDI Directors at the time of the SDI Buyout.[17]  Baxter was SDI's Chief Executive Officer.[18]  Wexler is TPB's President and Chief Executive Officer.[19]  Plaintiff alleges that Diao has been friends with the founder of Standard General, Soohyung Kim, since 2004 and that they served together on the board of directors of a company named Media General, Inc.[20]

---

[13] *Id.* ¶ 18.

[14] *Id.*

[15] Form S-4 at 92.

[16] *Id.*

[17] Defendants note that the Complaint incorrectly alleges that Wexler was an SDI director and that Baxter was TPB's CEO at Paragraphs 172 and 173 of the Complaint, and that their correct positions are set forth at Paragraphs 19 and 20 of the Complaint.  Director Defs.' Opening Br. 53 n.152.  Plaintiff does not dispute that the Complaint was incorrect in this respect and, in his Answering Brief, does not contend that Wexler was an SDI Director or that Baxter was TPB's CEO.  *See, e.g.*, Pl.'s Answering Br. 48–50.

[18] Compl. ¶ 20.

[19] *Id.* ¶ 19.

[20] *Id.* ¶ 21.

Plaintiff alleges that Glazek, Zimmerman, Baxter, Wexler, and Diao were conflicted and are incapable of causing the Company to pursue the claims asserted in this derivative action.[21]

## B.    SDI Proposes a Merger and TPB Forms the Special Committee.

TPB's holding company structure was inefficient.    According to the Complaint, the holding company structure caused SDI's common stock to trade at a significant discount relative to the value of its primary asset—TPB stock—and, in turn, caused TPB's stock to suffer decreased trading liquidity and reduced public float.    SDI's ownership of TPB generated administrative, managerial, and legal costs.    By late 2019, SDI's ownership of a majority of TPB's common stock was SDI's only meaningful asset.    The Complaint alleges that the Billboard Business was generating comparatively immaterial profit and, by November 6, 2019, Maidstone Insurance was to be conveyed to New York insurance regulators for insolvency.

In November 2019, unnamed SDI representatives initiated informal conversations with TPB management and members of the TPB board about a potential merger between TPB and SDI.[22]    On November 14, 2019, SDI delivered a term sheet (the "First Term Sheet") to TPB outlining proposed terms for the SDI Buyout.    The First Term Sheet contemplated a tax-free Subchapter A Reorganization

---

[21] *Id.* ¶¶ 170-75.

[22] Compl. ¶¶ 56–57 (quoting Form S-4 at 41).

under the Internal Revenue Code. SDI proposed a two-step transaction. The first step was to divest SDI of its comparatively immaterial, non-TPB assets. The second step called for TPB or a wholly owned subsidiary of TPB to acquire SDI in a stock-for-stock merger "based on an exchange ratio to be determined."[23]

On November 15, 2019, the TPB board met and established a Special Committee to evaluate the proposed transaction with SDI. The purpose of the Special Committee was to insulate negotiations between TPB and SDI from Glazek, Baxter, and Zimmerman.[24] Diao recused himself from service on the Special Committee, citing an "immaterial position in SDI stock."[25] The Special Committee thus consisted of Defendants Frushone and Hebard (collectively, the "Special Committee Defendants"). TPB's board of directors delegated broad powers to the Special Committee, including the power to say "no" to SDI and Standard General, the power to hire independent legal and financial advisors, and the power to examine and pursue alternative transactions.[26]

---

[23] *Id.* ¶¶ 60–62.

[24] Cannataro Aff. Ex. 2 at TPB_Berteau_000277 (forming the Special Committee "due to the existence of potential conflicts of interest of Messrs. Baxter, Glazek, and Zimmerman").

[25] *Id.* ("Mr. Diao noted that he had an immaterial position in SDI stock; while not disqualifying to serve as a special committee member, he nevertheless recused himself from consideration.").

[26] Compl. ¶ 64.

At the November 15, 2019 meeting of TPB's board of directors, attorneys at Lathrop GPM, LLP ("Lathrop") advised TPB's full board regarding the formation of the special committee. Lathrop then served as the Special Committee's counsel and as the Company's transactional counsel in the SDI Buyout.[27] Plaintiff alleges that TPB management appears to have chosen Lathrop as the Special Committee's counsel even before it was formed.[28]

### C. The First Term Sheet and the Special Committee's Initial Meetings

On November 18, 2019, both SDI and TPB publicly announced that SDI sought to "pursue" a merger with TPB.[29] TPB's press release stated that TPB had "formed a Special Committee of Independent Directors to engage in discussions with SDI."[30]

The Special Committee first met on November 25, 2019. The minutes of the November 25 meeting reflect that Lathrop directed and guided the discussions. The meeting began with Lathrop "present[ing] an overview of its role and responsibilities in any SDI transaction," although further information regarding Lathrop's authority, role, and responsibilities has been redacted from the minutes on the basis of attorney-

---

[27] *Id.* ¶¶ 66–67. The Complaint clarifies that the attorneys present at the November 2019 meeting were affiliated with Gray, Plant, Mooty, Mooty & Bennett P.A. before that firm's merger with Lathrop Gage LLP in January 2020. *Id.* ¶ 66 n.1.

[28] *Id.* ¶¶ 67–70.

[29] *Id.* ¶¶ 71–74.

[30] *Id.* ¶ 72.

client privilege.[31] The November 25 meeting minutes reflect that the Lathrop attorneys broadly advised the Special Committee, including regarding "a memo on the Committee's fiduciary duties and the committee process," "the need to hire legal and financial advisors," "the importance of doing appropriate due diligence on SDI," "an overview of what a typical transaction would look like," "an overview of the stockholder approval process and SEC review of the overall review [sic] of the transaction from a Delaware law perspective," and "the S-4 registration process and SEC review of same . . . and an overall transaction process timeline previously circulated."[32] There is no indication in the November 25 meeting minutes that the Special Committee members selected Lathrop as its counsel. Plaintiff alleges that the Special Committee did not engage in any inquiry regarding Lathrop's status as the Special Committee's counsel during this meeting or at any time thereafter.[33]

On December 12, 2019, the Special Committee retained Duff & Phelps LLP ("Duff & Phelps") as an "independent financial advisor to the Special Committee to provide an Opinion . . . from a financial point of view, to the stockholders of the Company of the Exchange Ratio . . . in the contemplated transaction."[34] Plaintiff

---

[31] Cannataro Aff. Ex. 4.

[32] *Id.* at TPB_Berteau_000290-91.

[33] Compl. ¶ 79 ("Rather, the S-4 and the 220 Production both show that Frushrone [sic] and Hebard never questioned, at the November 25 meeting or at any other time, Lathrop's seemingly established status as the Special Committee's counsel.").

[34] Compl. ¶ 83.

contends that Duff & Phelps's mandate was both too broad and too narrow. According to Plaintiff, Duff & Phelps's mandate was overbroad because it was retained to evaluate the financial fairness to all of TPB's stockholders, including Standard General and SDI, but it was also too narrow because Duff & Phelps was not permitted to consider alternative forms of merger consideration, including the possibility of incorporating cash consideration payable to TPB's stockholders.[35]

On the other side of the transaction, SDI's Board formed a single-member special committee to negotiate with TPB.[36] SDI's special committee retained Young, Conaway, Stargatt & Taylor LLP and Houlihan Lokey Capital, Inc. as its legal and financial advisors, respectively.

On January 9, 2020, the Special Committee met again.[37] The minutes of the January 9 meeting mention discussion of "a variety of matters, including engagement of advisors and corresponding budgets, due diligence process and overall timing."[38] A Lathrop attorney "asked for input on the timeline previously circulated" before the November 25 meeting, and Duff & Phelps noted that it had

---

[35] *Id.* ¶¶ 84 –86. Plaintiff alleges that "Subchapter A reorganizations permit a stock-cash mix of merger negotiations without impacting the transaction's tax-free status." *Id.* ¶ 86.

[36] Form S-4 at 42.

[37] The Complaint alleges that the Special Committee meeting occurred on January 8, 2020, Compl. ¶ 88, but the meeting minutes reflect that it was held on January 9, 2020. Cannataro Aff. Ex. 5; *see also* Director Defs.' Opening Br. 13 n.32 (clarifying the same).

[38] Cannataro Aff. Ex. 5.

begun reviewing comparable publicly available transactions. The January 9 meeting minutes state, without identifying any actor or speaker, that "[i]t was noted that no formal proposal had been made by [SDI] or its advisors in follow up to the initial indication of interest" and that "[i]t was resolved" that an attorney from Lathrop would "reach out to SDI's counsel to determine next steps."[39] According to the minutes, the meeting was "called to order at approximately 3:00 Eastern Standard Time" and that it was "adjourned at approximately 2:30 Eastern Standard Time," half an hour before the meeting purportedly began.[40]

### D. The Second Term Sheet and the Special Committee's Analysis of the Exchange Ratio

On January 22, 2020, SDI delivered a second term sheet to the Special Committee (the "Second Term Sheet"). The Second Term Sheet was more specific than the First Term Sheet. The Second Term Sheet provided for a 1:1 stock-for-stock exchange ratio and that TPB would assume all of SDI's debt.[41]

On January 28, 2020, the Special Committee met with its counsel. The Form S-4 discloses that, the prior day, the Special Committee "engaged the law firm of Blank Rome LLP . . . to advise the TPB special committee on aspects of Delaware

---

[39] *Id.*

[40] *Id.*

[41] Cannataro Aff. Ex. 6; *see id.* Ex. 9 at TPB_Berteau_000311 (indicating that SDI had $23.8 million in debt as of June 30, 2019); *id.* Ex. 11 at TPB_Berteau_000325 (calculating SDI's net liabilities to be $9.7 million as of January 31, 2020).

11

law applicable to the potential transaction with SDI."[42]  The minutes of the January 28 meeting state that the Special Committee and its counsel discussed the Second Term Sheet, along with "the application of *Kahn vs. M & F Worldwide Corp.* ('MFW') and Delaware decisions refining the principle [sic] holding of MFW," and then discussed "Delaware law process, timing and next steps regarding the [Second Term Sheet] and follow up on same."[43]

On January 30, 2020, the Special Committee met with its counsel and Duff & Phelps to again discuss the Second Term Sheet.  The minutes of the January 30 meeting indicate that the Special Committee discussed "the exchange ratio and the potential to negotiate expense reimbursement for the Company."[44]  Blank Rome "updated the Committee on their research into Delaware law relative to the Company obtaining a 'majority of the minority' stockholder vote as a precondition to the SDI Proposal."[45]

The January 30 meeting also included a Duff & Phelps analysis of the Second Term Sheet.  In a slide entitled "SDI Valuation Discount," Duff & Phelps reported that SDI's stock was trading at a significant discount relative to that of TPB.[46]  Duff

---

[42] Form S-4 at 42.

[43] Cannataro Aff. Ex. 7.

[44] *Id.* Ex. 8.

[45] *Id.*

[46] *Id.* Ex. 9 at TPB_Berteau_000315.

12

& Phelps indicated that, using November 15, 2019 as the date for SDI's unaffected share price, SDI's stock traded at a 30.2% discount to TPB's stock. Duff & Phelps further calculated the implied valuation discount based upon the 5-day, 10-day, 30-day, 90-day, and 180-day unaffected volume weighted average prices of TPB and SDI stock. The resulting discounts ranged from 17% to 29.8%. The Form S-4 presents a Duff & Phelps historical trading analysis that discloses a range of the discount in dollar values between January 1, 2018 and November 15, 2019, but does not present the percentage discount based on the volume weighted average prices that Duff & Phelps presented at the January 30 meeting.[47]

### E. The Third Term Sheet and the Majority-of-the-Minority Vote Proposal

The Complaint alleges that the Special Committee, "between January 28 and February 6, 2020, demanded that the SDI buyout be conditioned on the affirmative vote of a majority of TPB's minority stockholders."[48] The Form S-4 states that, on February 6, 2020, the SDI special committee sent a revised non-binding term sheet (the "Third Term Sheet") to "Lathrop and Blank Rome, on behalf [of] the TPB

---

[47] Form S-4 at 56 ("Duff & Phelps noted that for the period from January 1, 2018 to November 15, 2019, the aggregate discount ranged between a low of $4.6 million and a high of $193.6 million.").

[48] Compl. ¶ 103.

13

special committee."[49]   The "primary change" in the Third Term Sheet "was to provide that in addition to the approval of the stockholders of both TPB and SDI, the consummation of the transaction would be subject to the approval of the holders of the majority of outstanding shares of TPB Common Stock not beneficially owned by SDI or any officer of TPB."[50]   The Form S-4 states that "though the parties and their respective counsel discussed this provision on several occasions, this proposed condition became inapplicable once the parties determined that the approval of TPB stockholders was not required for the consummation of the merger."[51]   The minutes of the Special Committee meetings nowhere indicate that the Special Committee determined that the proposed majority-of-the-minority vote by TPB stockholders "became inapplicable" after a determination by the parties "that the approval of TPB stockholders was not required for consummation of the merger."[52]   Plaintiff alleges that the Special Committee abandoned its demand for a majority-of-the-minority vote condition because "SDI changed its position and refused to agree to it."[53]

---

[49] Form S-4 at 43.  Other term sheets referenced in the Complaint and in the Form S-4 are attached to Defendants' briefing, but the Third Term Sheet is not in the record.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Compl. ¶ 107.

14

On February 12, 2020, the Special Committee met with its legal advisors and Duff & Phelps. The minutes of that meeting state that the Special Committee discussed SDI's balance sheet and "the proposal of terms delivered to the Committee's counsel on January 22, 2019 [sic] (the 'SDI Proposal')."[54] The minutes of the February 12 meeting indicate that the Special Committee evaluated the Second Term Sheet, rather than the Third Term Sheet, which had been delivered to the Special Committee's counsel six days prior to the February 12 meeting.[55]

Duff & Phelps made a presentation to the Special Committee at the February 12 meeting. The first slide in Duff & Phelps's February 12 presentation is entitled "Negotiation Considerations."[56] Duff & Phelps stated that, "[p]rior to the announcement of the proposed transaction (November 15, 2019), the market implied a discount of approximately $78.5 million, or 30%, to the value of TPB shares owned by SDI."[57] Duff & Phelps ascribed the discount to "economic inefficiencies and implications associated with realizing the underlying value of the TPB shares."[58]

---

[54] Cannataro Aff. Ex. 10.

[55] *Id.* The Form S-4 discloses that, on February 10, 2020, SDI's special committee sent the Special Committee a draft merger agreement "reflect[ing] the material terms and conditions" of the Second Term Sheet. Form S-4 at 43. The minutes of the February 12, 2020 Special Committee meeting do not state that the Special Committee considered the draft merger agreement.

[56] Cannataro Aff. Ex. 11 at TPB-Berteau_000325.

[57] *Id*.

[58] *Id.*

Duff & Phelps's February 12 presentation contains a clear portrait of the economic effects of the exchange ratio to TPB's stockholders and to SDI's stockholders. Duff & Phelps observed that, "[b]ased on a review of comparable transactions, the observed discount to a one-for-one exchange ranged from 0.0% to 14.6%, with an average discount of 4.5%."[59] Duff & Phelps provided a table demonstrating how the economic benefit would be allocated to SDI's stockholders versus TPB's stockholders based on the exchange ratio variable[60]:

| Discount to 1:1 Exchange | Benefit to SDI Shareholders | Benefit to TPB Shareholders | Aggregate Premium to TPB Shareholders |
|---|---|---|---|
| 0% (Current SDI Proposal) | $78.5 | $0.0 | 0.00% |
| 1.5% | $74.6 | $3.9 | 0.75% |
| 15.0% | $39.5 | $39.0 | 7.50% |
| 30.2% (Market Implied) | $0.0 | $78.5 | 15.10% |

The Special Committee's February 12 meeting is not disclosed in the Form S-4.

On the morning of February 18, 2020, the Special Committee met with its legal advisors. The first order of business was an update regarding communications between counsel to the Special Committee, Christopher Carlisle, and counsel to SDI's special committee, Jim Hughes. According to Carlisle:

> Mr. Hughes communicated at this time SDI was unwilling to move forward with the proposed SDI-Company transaction if the Company required as a condition thereto the approval of a "majority of the minority" of its stockholders. Mr. Carlisle stated Mr. Hughes made it clear in their conversation that under no circumstances would SDI

---

[59] *Id.*

[60] *Id.*

16

proceed with the SDI-Company transaction conditioned upon a Company majority of the minority vote.[61]

In essence, Carlisle notified the Special Committee that SDI's special committee—after having delivered the Third Term Sheet containing a majority-of-the-minority vote—had abruptly reversed course and declared that conditioning the transaction on a majority-of-the-minority vote was unacceptable.

The minutes of the February 18, 2020 meeting state that the Special Committee assessed that the "significant benefits" of a possible transaction with SDI were worth proceeding without pursuing the majority-of-the-minority vote that SDI's special committee had proposed 12 days prior.[62] According to the minutes:

> In light of the foregoing, a discussion ensued regarding whether or not there were potential benefits to the Company and its stockholders in considering a transaction with SDI, without such a vote. Possible benefits to be realized, include the potential accretive value of the Company's common stock which would benefit current stockholders, eliminating the negative market perception of having a greater than 50% controlling stockholder, eliminating administrative and accounting expenses associated with having an SEC reporting company as the Company's majority stockholder and creating a greater public float in the Company's common stock. Following the discussion, and after further considering Delaware law as respects whether a Company stockholder vote is required given the structure of the transaction, and given the choice of structure for genuine tax and business purposes, the Committee determined that there were significant benefits to be derived by the Company's stockholders, and that a possible transaction with SDI should be continued to be pursued, without the condition of

---

[61] *Id.* Ex. 12.

[62] *Id.*

17

obtaining a majority of the minority vote of the Company's stockholders.[63]

The meeting of the Special Committee on the morning of February 18, 2020 lasted 45 minutes.

The Special Committee met again that evening with its legal and financial advisors. According to the minutes, "[i]t was reported that SDI's counsel had stated emphatically to Mr. Carlisle that SDI would not proceed with the transaction if the Company required that a majority of the minority of the Company's stockholders approve the transaction."[64] The Special Committee and Duff & Phelps "discussed various financial aspects of comparable transactions" and agreed upon a "counter-proposal regarding the exchange ratio and other terms" to be sent the following day.[65]

**F.      The Parties Negotiate the Exchange Ratio and Other Terms.**

On February 19, 2020, Lathrop conveyed the Special Committee's counterproposal to SDI's special committee (the "Fourth Term Sheet"). The Special Committee proposed an exchange ratio of 0.90x, minus a number of shares of TPB common stock based on SDI's net liabilities.[66] The counterproposal further required

---

[63] *Id.*

[64] *Id.* Ex. 13.

[65] *Id.*

[66] Compl. ¶ 115; Form S-4 at 43.

18

SDI to divest the Maidstone Insurance and Billboard Business segments, to indemnify TPB for transaction costs and expenses, to place $15 million in escrow for a year to fund SDI's indemnification obligations, and to agree to pay a "market break-up fee" if SDI accepted a superior proposal.[67] The Form S-4 discloses in passing that, "[o]ver the next several days, counsel and advisors to SDI and TPB continued to interact regarding aspects of the transaction" and that members of SDI's and TPB's special committees "engaged in numerous conversations and discussions over this period."[68] On February 28, 2020, the Special Committee sent SDI's special committee a revised draft of the merger agreement that incorporated the changes in the Fourth Term Sheet.[69] The Form S-4, again in cursory fashion, stated that, following this delivery, "[o]ver the next several days," members of SDI's and TPB's special committees "engaged in numerous conversations and discussions over this period."[70]

SDI rejected the Special Committee's counterproposal in the Fourth Term Sheet. On March 3, 2020, SDI's special committee updated SDI's full board of directors on the transaction process and the TPB Special Committee's proposed revisions to the merger agreement. The Form S-4 states: "The SDI special

---

[67] Form S-4 at 43.

[68] *Id.*

[69] *Id.* at 44.

[70] *Id.*

19

committee indicated its view, with which the SDI Board concurred, that the revisions proposed by TPB were not acceptable."[71]

On March 10, 2020, SDI's special committee responded to TPB, rejecting almost all of the material terms proposed in the Fourth Term Sheet. SDI's special committee demanded a 1:1 exchange ratio, with SDI having no net liabilities at closing, and it agreed to cover only $250,000 of TPB's reasonable transaction fees and expenses.[72] Over the next two weeks, the two special committees traded proposals concerning the exchange ratio, transaction expenses, and the extent of SDI's liabilities at closing:

- On March 20, 2020, TPB's Special Committee proposed an exchange ratio of 0.925x, $1 million in transaction fees and expenses, and that SDI would have no more than $25,000 in net liabilities at closing.

- On March 21, 2020, SDI's special committee counterproposed that the exchange ratio would be 0.97x and that SDI would have no more than $100,000 in net liabilities at closing.

- On March 22, 2020, TPB's Special Committee counterproposed an exchange ratio of 0.945x and that SDI would have no more than $25,000 in net liabilities at closing.

---

[71] *Id.*

[72] *Id.*

- On March 23, 2020, SDI's special committee counterproposed an exchange ratio of 0.97x, $1 million in transaction fees and expenses, and that SDI would have no more than $25,000 in net liabilities at closing.[73]

The record does not identify any formal meetings of the TPB Special Committee during this two-week negotiation period.

### G. SDI's Board and TPB's Board Intervene.

On March 24, 2020, SDI's special committee updated SDI's full board of directors on the status of negotiations. Even though SDI's special committee had been engaged in substantive negotiations with TPB's Special Committee regarding the exchange ratio, SDI's board of directors pressured SDI's special committee to execute the transaction at a 1:1 exchange ratio. According to the Form S-4, unnamed "members of the SDI Board asked questions concerning why the terms being discussed by the two committees did not align more closely with the original 1:1 exchange ratio that had been first proposed by the SDI special committee to TPB's special committee."[74] SDI's board of directors "requested that the SDI special

---

[73] Compl. ¶¶ 118–21; Form S-4 at 44.

[74] Form S-4 at 44–45.

committee hold further discussions with the TPB special committee regarding this point."[75] SDI's special committee complied.

According to the Form S-4, on March 25, 2020, the SDI special committee "communicated to the TPB special committee that the originally proposed exchange ratio of 1:1 was one that reflected the best interests of SDI and its stockholders."[76] The Form S-4 also states that, on the same date, TPB's "special committee met with its counsel and financial advisors" to discuss the SDI special committee's reversal from its prior position. There are no minutes of a March 25, 2020 Special Committee meeting in the record.

The TPB and SDI special committees met together the next day. The Form S-4 discloses that the committees discussed "alternative potential terms" providing for an exchange ratio of 0.99x, SDI paying $500,000 in transaction fees and expenses, and SDI maintaining a balance sheet with liabilities not exceeding $25,000 at closing.[77]

The special committees returned to their respective camps to discuss the prior day's efforts. On SDI's side, its board met with the SDI special committee. The

---

[75] *Id.* at 45.

[76] *Id.*

[77] *Id.*

22

board communicated to the SDI special committee that SDI would support a transaction incorporating the terms discussed on March 26, 2020.[78]

On TPB's side, the Form S-4 discloses that, on Friday, March 27, 2020, "[i]t was determined that a proposal based on such terms would not be acceptable to the TPB special committee."[79] The minutes of the March 27 meeting provide no detail regarding this purported determination. The minutes state that Hebard provided an update regarding "the outline of the proposed transaction between SDI and the Company" that was discussed on March 26.[80] Thereafter, "[a] discussion ensued and the Duff & Phelps team advised the Committee on their preliminary views of the Proposal."[81] The Duff & Phelps team then left the meeting. After Duff & Phelps departed, "[t]he Committee and counsel discussion [sic] a variety of matters, including the memorandum email circulated to the Committee by [Blank Rome] before the Meeting, approach [sic] to the contemplated board meeting of the Company on March 28 and related matters. A discussion ensued throughout."[82] The meeting minutes do not explain why Duff & Phelps left the meeting, and they do not

---

[78] *Id.*

[79] *Id.*

[80] Cannataro Aff. Ex. 14.

[81] *Id.*

[82] *Id.* Plaintiff alleges that there was no meeting of TPB's board of directors on March 28, 2020, Compl. ¶ 133, but it is a reasonable inference that the meeting as anticipated by the Special Committee took place on the following day, on March 29, 2020.

23

specifically indicate that any party other than Duff & Phelps voiced a view regarding the merger terms.

According to the Form S-4, on Saturday, March 28, 2020, the Special Committee informed SDI's special committee that TPB "could not proceed" on the terms discussed by the special committees on March 26.[83]  For some reason not disclosed in the Form S-4, this communication triggered a flurry of activity that marked the beginning of the end of the Special Committee process.  According to the Form S-4, that same day, members of the special committees and their advisors discussed the merger terms "in consultation respectively with members of the full boards of each company."[84]

The negotiations on Saturday culminated in three sequential meetings the following morning, on Sunday, March 29, 2020.  The first meeting was between the TPB and SDI special committees.  The Form S-4 indicates that the special committees discussed a draft merger agreement contemplating a .97x exchange ratio, "SDI retaining approximately $1,000,000 of net cash on its balance sheet at closing," no termination fee payable to SDI if TPB pursued an alternative transaction, and that "the SDI termination fee would be 2% of the equity value of SDI."[85]

---

[83] Form S-4 at 45.

[84] *Id.*

[85] *Id.*  The Form S-4 does not indicate what conditions would be necessary for payment of this termination fee.

The second meeting was that of SDI's board of directors, at which the SDI special committee conveyed the terms discussed with the TPB special committee that morning. According to the Form S-4, the SDI board of directors "indicated to the SDI special committee that it could support a transaction consistent with these terms subject to satisfactory negotiation of definitive documents and continued discussions between the SDI special committee and its advisors."[86] The Form S-4 nowhere indicates that Glazek, Zimmerman, and Baxter did not attend the second meeting of SDI's board of directors on March 29, 2020. The reasonable inference is that they did.

The third meeting was a special meeting of TPB's full board of directors (the "March 29 TPB Meeting"). The telephonic meeting began at 10:00 a.m.[87] All seven TPB directors dialed into the March 29 meeting. The Special Committee's legal and financial advisors were not present. According to the minutes, Glazek stated that the purpose of the meeting was to provide the Special Committee "the opportunity to update the full Board regarding the status of a possible merger" with SDI.[88] Glazek then asked Hebard to present the update from the Special Committee.

---

[86] *Id.*

[87] Cannataro Aff. Ex. 15. The minutes of this meeting do not specify the time zone. The record does not reflect when the other two March 29 meetings began or how long they lasted. Given that it was a Sunday morning and that the world was in the early stages of a pandemic, the court assumes that all three meetings were telephonic.

[88] *Id.*

25

Hebard "noted that she was not requesting any action by the Board at this meeting," and informed TPB's board that the "current contemplated terms" for the transaction were a .97x exchange ratio and that SDI's net liabilities would not exceed $25,000 at closing.[89] The minutes state that the Special Committee "chose Lathrop GPM LLP as legal counsel, along with Blank Rome LLP as its special Delaware law counsel."[90] After reviewing the Special Committee's process, Hebard "discussed with the Board Delaware law issues related to the process and the potential transaction."[91]

The March 29 TPB Meeting minutes state that TPB's full Board of Directors discussed the transaction. Glazek "reviewed reasons for the potential transaction from both the TPB and the SDI perspective."[92] The full Board then discussed merger issues, "including net liabilities at closing, potential representation & warranty insurance, additional possible terms in the definitive agreement, the timing of a potential fairness opinion, and the risks and potential costs of litigation."[93] After the

---

[89] *Id.* These terms are not the same terms that the special committees discussed that morning according to the Form S-4. *Compare id.* (stating that, under the current proposal, SDI's net liabilities would not exceed $25,000 at closing), *with* Form S-4 at 45 (disclosing that, in addition to a 0.97x exchange ratio, SDI would "retain[] approximately $1,000,000 of net cash on its balance sheet at closing"); *see also* Special Committee Defendants' Ex. A at 7 (listing the net liability term and only citing the Form S-4).

[90] Cannataro Aff. Ex. 15 at TPB_Berteau_000281.

[91] *Id.*

[92] *Id.*

[93] *Id.*

Board discussed these issues, Glazek, Baxter, and Zimmerman "excused themselves from the meeting."[94] For the following 15 minutes, the "remaining directors held additional discussion regarding the terms of a potential transaction with SDI."[95] The minutes do not specify the terms that were the subject of the "additional discussion," why Glazek, Baxter, and Zimmerman excused themselves, or why Diao and Wexler remained to discuss the terms of a potential transaction with SDI after Glazek, Baxter, and Zimmerman excused themselves.

After the Special Committee, Wexler, and Diao concluded their private transaction discussions, Glazek, Baxter, and Zimmerman rejoined the meeting. The TPB Board then continued to discuss the merger for nine minutes. According to the minutes, the Board's discussion included "a potential timeline towards negotiation and execution of a definitive agreement . . . issues related to a fairness opinion, the approval of the Special Committee and the Board, and announcement of a transaction."[96] The meeting adjourned at 11:34 a.m.

### H. Merger Negotiations Cease Regarding the Exchange Ratio.

After the March 29, 2020 meetings, there were no further negotiations over the exchange ratio. The Form S-4 states that, "[o]ver the next several days," the

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

special committees' counsel "exchanged revised drafts of the merger agreement, focusing primarily on the exchange ratio and net cash and liabilities at SDI, and moving away from an expense reimbursement provision."[97] There is no indication, however, that any price terms materially changed as a result of these exchanged drafts.[98] The record does not indicate that the two special committees directly discussed any matter again after the March 29 TPB Meeting.

The Special Committee met two additional times. On March 30, 2020, the Special Committee discussed a draft final fairness opinion from Duff & Phelps at a 0.97x exchange ratio. On April 7, 2020, Duff & Phelps presented its final fairness opinion concerning the SDI Buyout, Lathrop circulated the final merger agreement, and the Special Committee approved the SDI Buyout. The Duff & Phelps fairness analyses presented on March 30 and April 7, 2020 indicated that, based on the 0.97x exchange ratio, TPB's stockholders stood to gain 9.9% of the transaction's economic benefit, representing $6.9 million, based on the Company's unaffected stock price

---

[97] Form S-4 at 45–46.

[98] Id.; see also Merger Agreement at A-45 (defining "Stock Merger Consideration" as "a total number of shares of TPB Common Stock equal to 97% of the total number of shares of TPB Common Stock owned by SDI as of the Effective Time of the Merger."); id. §§ 1.7 & 7.8 (requiring SDI to provide a Net Liabilities Estimate to TPB that reflects Net Liabilities "in amount not exceeding $25,000" and that will "be reasonably acceptable to TPB" as a condition precedent). The Merger Agreement did not require SDI to hold $1,000,000 in net cash at closing.

on November 15, 2019.[99]  SDI and its stockholders obtained the remaining economic benefit of $69 million.[100]

According to the minutes of the Special Committee's April 7, 2020 meeting, Duff & Phelps determined that "the exchange ratio negotiated in connection with the proposed transaction was fair to the stockholders of the Company."[101]  At the same April 7 meeting, the Special Committee resolved that the proposed merger was "fair to and in the best interests of the stockholders of the Company (excluding SDI and its affiliates)," even though Duff & Phelps's fairness opinion did not specifically address the financial fairness of the transaction to the Company's minority stockholders.[102]  There is no indication in the record that the Special Committee considered a fairness opinion from the perspective of the TPB stockholders unaffiliated with SDI.

---

[99] Cannataro Aff. Ex. 19 at TPB_Berteau_000358.

[100] This is the result after SDI's sale of $9.6 million in TPB stock to satisfy $25 million in debt. *Id.*

[101] *Id.* Ex. 18; *see also id.* Ex. 19 (presentation from Duff & Phelps describing its engagement as "provid[ing] an opinion . . . as to the fairness, from a financial point of view, to the stockholders of the Company of the Exchange Ratio").

[102] *Id.* Ex. 18.

The parties executed the merger agreement for the SDI Buyout on April 7, 2020 (the "Merger Agreement") and announced the transaction on the following day.[103]

## I.  SDI Conducts a Public Offering of TPB Shares.

On June 8, 2020, two months after the parties signed the merger agreement, SDI sold 1.8 million shares of its TPB stock at $23.50 per share in an underwritten public offering.[104]  Standard General-managed funds participated in the public offering and sold 415,000 shares of TPB stock at the same price.[105]  The Complaint alleges that SDI reportedly received approximately $40 million, with approximately $24 million to retire its debt and approximately $16 million to repurchase shares of SDI's Class B common stock from another Standard General fund.[106]  Public filings indicate that the latter transaction took place on July 13, 2020.[107]

Plaintiff alleges that the Special Committee did not know that $16 million of the $40 million earned through the public offering would be used to repurchase SDI's stock from Standard General.  Plaintiff alleges SDI's stock purchase unfairly

---

[103] Compl. ¶ 152.

[104] *Id.* ¶ 153.  Duff & Phelps's fairness opinion assumed that SDI would sell 1,201,346 shares, at the then-current market price of $20.81 per share to satisfy $25 million of debt at SDI.  Cannataro Aff. ¶ Ex. 19 at TPB_Berteau_000358.

[105] Compl. ¶ 153.

[106] *Id.* ¶ 154.

[107] *Id.* ¶ 155.

benefited Standard General at TPB's expense, because if the cash had remained with SDI, it would have gone to TPB through the SDI Buyout. Plaintiff further contends that the repurchase violated Section 4.1(b)(1) of the Merger Agreement, which provides that, except as set forth in a disclosure letter from SDI, SDI would not "reacquire any shares of its capital stock or other securities."[108]

## J. The Merger Closes and Standard General Reduces Its Ownership Stake in TPB

At a July 9, 2020 special meeting of SDI stockholders, Standard General voted its shares in favor of the SDI Buyout, and the merger closed pursuant to the Merger Agreement.[109] After the SDI Buyout closed, Standard General amended its Schedule 13-D to indicate that it had reduced its holdings to 33.5% of TPB's outstanding common stock.[110]

## K. Procedural History

Plaintiff filed his three-count Complaint in this action on October 9, 2020.

Count I is a claim against the Standard General Defendants for breach of fiduciary duty as TPB's controlling stockholder. Plaintiff alleges that the Standard

---

[108] *See* Merger Agreement at A-19.

[109] Compl. ¶ 159.

[110] *Id.*

31

General Defendants violated their fiduciary duty of loyalty to TPB's stockholders and that the SDI Buyout was not entirely fair to TPB or its public stockholders."[111]

Count II alleges that the Director Defendants and the Special Committee Defendants breached their fiduciary duties.

Count III is a direct claim for breach of contract against the Director Defendants and TPB. It alleges that Article IX of TPB's bylaws, which require a two-thirds supermajority vote of the Company's stockholders to amend the bylaws, is invalid because the Company's Certificate of Incorporation provides that the bylaws could be amended by majority vote of the outstanding shares of stock of TPB.[112] Plaintiff seeks equitable relief in his Complaint, "including rescission, rescissory damages, disgorgement to the Company," and a declaration that the supermajority bylaw was invalid.[113]

Defendants have moved to dismiss the Complaint pursuant to Court of Chancery Rules 12(b)(6) and 23.1. The Director Defendants further seek dismissal of Count III on grounds of mootness pursuant to Court of Chancery Rule 12(b)(1). In his Answering Brief, Plaintiff agreed that Count III was moot because "TPB rescinded its Supermajority Bylaw after the filing of the Complaint."[114] The parties

---

[111] *Id.* ¶¶ 177–79.

[112] *Id.* ¶¶ 160–166.

[113] *Id.* at 57.

[114] Pl.'s Answering Br. 68–69.

completed briefing on March 12, 2020, and the court heard oral argument on March 23, 2020.

## II. ANALYSIS

### A. Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted). The pleading standards are minimal. *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). Nevertheless, "a trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the

33

complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

### 1.    Entire Fairness Applies.

The SDI Buyout is a transaction between TPB and its controlling stockholder. "When a transaction involving self-dealing by a controlling stockholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion." *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994) ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness."). "Under current law, the entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit." *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016); *see also Salladay v. Lev*, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020) (noting that entire fairness applies where "a controlling stockholder is conflicted or competes for consideration with fellow stockholders").

This transaction presents a classic self-dealing transaction involving a controlling stockholder. SDI, and ultimately the Standard General Defendants, stood on both sides of the SDI Buyout and extracted a unique benefit from the

34

transaction not ratably shared with TPB's other common stockholders. As the owners of a majority of TPB's common stock, SDI and the Standard General Defendants were controlling stockholders that owed TPB fiduciary duties at the time of the SDI Buyout. Of the seven directors on TPB's board of directors, three directors served on SDI's board of directors, and one served as TPB's CEO. The Complaint contains well-pleaded allegations that SDI, and ultimately the Standard General Defendants, received a disproportionate share of the benefit achieved by the transaction not shared with TPB's other stockholders, and that they competed with the minority stockholders for the transaction consideration.[115] The entire fairness

---

[115] Compl. ¶ 7 ("Duff & Phelps's financial analyses contained in the 220 Production, while flawed, explain that at a 0.97x ratio, SDI would receive more than 90% of the zero-sum transaction's financial benefits, with less than 10% of the financial benefits flowing to the whole of TPB's stockholders"); *id.* ¶ 111 ("At every 1.5% discount, the chart shows, $3.9 million of the deal's financial benefit is transferred to 'TPB Shareholders.' Accordingly, at a 3% discount, or a 0.97 exchange ratio, the chart shows that $6.8 million of the deal's $78.5 million overall financial benefit – or 9.9% – would flow to TPB stockholders"); Cannataro Aff. Ex. 11 at TPB_Berteau_000325 (Duff & Phelps presentation calculating benefits to SDI stockholders versus TPB stockholders at a range of exchange ratios). While it does not affect the outcome of this Opinion, under Plaintiff's approach, a 3% discount implies that $7.8 million of the deal's financial benefit flowed to TPB's stockholders, not $6.8 million. This is consistent with Duff & Phelps's later presentations. *See id.* at TPB_Berteau_000342 (noting that the aggregate economic benefit was $7.8 million to TPB's stockholders, implying that TPB's stockholders would receive 9.9% of the of the economic benefit from the transaction).

standard therefore applies.[116]  Neither the Standard General Defendants nor the Director Defendants—including Glazek, Zimmerman, and Baxter, who served as directors on both TPB's board of directors and SDI's board of directors—meaningfully contend otherwise. [117]

The Special Committee Defendants advance a novel, but unpersuasive, argument that the standard of review should be business judgment.[118]  According to the Special Committee Defendants, the safe harbor for parent-subsidiary mergers set forth in *Kahn v. M & F Worldwide Corp.* ("*MFW*") should not require a majority-of-the-minority vote for the business judgment rule to apply to parent-subsidiary

---

[116] *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) (holding that entire fairness applies in self-dealing transactions between a parent and its subsidiary and that "[s]elf-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary"); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain."); *Salladay*, 2020 WL 954032, at *1 ("It is axiomatic that transactions in which a majority of the board stands on both sides of a deal raise questions of whether the directors have acted in their own, and not the corporate, interest; and that in such situations, the presumption of business judgement is overcome and the burden shifts to the conflicted fiduciaries to show that the transaction is entirely fair.").

[117] Defendants do not argue that a majority of the board was disinterested and independent with respect to the SDI Buyout.

[118] Notably, the Director Defendants—including Glazek, Zimmerman, and Baxter, who served as directors on both TPB's board of directors and SDI's board of directors—refrained from making the same argument in their briefing.

36

mergers that do not statutorily require a stockholder vote.[119] Their argument ignores the history of the *MFW* doctrine and what it was intended to address.

*MFW* was the culmination of years of doctrinal debate over what had been viewed as a *per se* inability of a defendant to prevail on a pleadings-stage motion to dismiss a claim challenging a controlling stockholder transaction. *See In re MFW S'holders Litig.*, 67 A.3d 496, 504 (Del. Ch. 2013) (noting that one purpose of the *MFW* framework was to remedy a doctrinal situation in which "there is no feasible way for defendants to get [cases] dismissed on the pleadings"), *aff'd*, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014); *In re Books-a-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *8 n.2 (Del. Ch. Oct. 10, 2016) (same), *aff'd*, 164 A.3d 56 (Del. 2017); *Tornetta v. Musk*, 2019 WL 4566943, at *12 n.114 (Del. Ch. Sept. 20, 2019) (same).[120] In *MFW*, the Delaware Supreme Court held that the business judgment rule applies in a controlling stockholder merger "where the merger is conditioned *ab initio* upon both the approval of an independent, adequately empowered Special Committee that fulfills its duty of care, and the uncoerced, informed vote of a majority of the minority stockholders." *MFW*, 88 A.3d at 644,

---

[119] Special Committee Defs.' Opening Br. 13 ("[B]ecause no TPB shareholder vote was required, no [majority of the minority vote] should be required to secure business judgment deference.").

[120] *See In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 614–15 (Del. Ch. 2005) (discussing the history of the doctrinal debate); *id.* at 607 (suggesting "giving defendants the real option to get rid of cases on the pleadings, the integrity of the representative litigation process would be improved").

*overruled on other grounds*, *Flood v. Synutra Int'l., Inc.*, 195 A.3d 754, 766 n.81 (Del. 2018).

*MFW* was a decision on summary judgment and involved a squeeze-out merger. Subsequent opinions have applied *MFW* at the motion to dismiss stage. *See, e.g., Books-A-Million*, 2016 WL 5874974, at *8; *Swomley v. Schlecht*, C.A. No. 9355-VCL at 64–79 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd,* 128 A.3d 992 (Del. 2015) (TABLE). The Court of Chancery has held that the *MFW* safe harbor requiring a majority-of-the-minority vote and a properly functioning special committee applies to numerous types of controlling stockholder transactions that do not statutorily require a stockholder vote. As Chancellor Bouchard summarized, the Court of Chancery has applied entire fairness review to "(1) security issuances, purchases, and repurchases; (2) asset leases and acquisitions; (3) compensation arrangements, consulting agreements, and service agreements; (4) settlements of derivative actions; and (5) recapitalizations." *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *7 (Del. Ch. Dec. 11, 2017) (citing *EZCORP*, 2016 WL 301245, at *11–15). Chancellor Bouchard reasoned that the *MFW* framework "should be encouraged to protect the interests of minority stockholders in transactions involving controllers, whether it be a squeeze-out merger (*MFW*), a merger with a third party (*Martha Stewart*), or one in which the minority stockholders retain their interests in the corporation (*EZCORP*)." *Id.* at *11

38

(collecting cases). Chancellor Bouchard determined that he could identify "no principled basis on which to conclude that the dual protections in the *MFW* framework should apply to squeeze-out mergers but not to other forms of controller transactions." *Id.*

As in *Crane*, I can discern no principled basis to conclude that the *MFW* framework is inapplicable in this case. The SDI Buyout was less protective of minority stockholders' rights than a typical parent-subsidiary merger because it did not require any stockholder vote. A special committee is not sufficient protection for TPB's minority stockholders because "[a] special committee alone ensures only that there is a bargaining agent who can negotiate price and address the collective action problem facing stockholders, but it does not provide stockholders any chance to protect themselves." *In re MFW S'holders Litig.*, 67 A.3d at 503; *see also In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) ("The majority of the minority vote . . . provides the stockholders an important opportunity to approve or disapprove of the work of the special committee and to stop a transaction they believe is not in their best interests."). The Special Committee Defendants have identified no special protection under these circumstances that would warrant a departure from the rule set forth in *MFW*. On the contrary, it would lead to the application of business judgment review where

minority stockholders were less protected than in a traditional parent-subsidiary merger.

The Special Committee Defendants make no attempt to distinguish other controller transactions in which the court has applied *MFW*. Instead, they rely on *dicta* in a case where the same argument was rejected. In *Tornetta*, 2019 WL 4566943, at *13, the court assessed a board's decision to award its controlling stockholder executive compensation. The court noted the traditional deference afforded a board in making compensation decisions. It also recognized that stockholders had voted to approve the compensation arrangement with the controlling stockholder. The court in *Tornetta*, nevertheless, declined to apply any lesser standard than entire fairness. In a footnote, the court remarked that it saw "nothing in either the Chancery or Supreme Court *MFW* decisions . . . to suggest either court intended to hold that the dual protections are required in all controlling stockholder transactions in order to reduce the degree of judicial scrutiny paid to the transaction." *Id.* at *13 n.125. The court did not opine on which controlling stockholder transactions might not require the dual protections of *MFW* to obtain a lesser degree of scrutiny than entire fairness. *Tornetta* does not mandate—nor even imply—that anything short of the dual protections of *MFW* should be required to lower the standard of review to the SDI Buyout—a merger—at issue in this case.

The Special Committee Defendants' arguments in favor of application of the business judgment rule are generally founded on thin factual assumptions that disregard the allegations of the Complaint. The Special Committee Defendants rely ostensibly on the fact that the merger was structured as a forward triangular merger and, thus, a TPB stockholder vote was not statutorily required. That may be so, but a transaction to remove SDI as a holding company could have been structured to require a vote of TPB's stockholders. The Complaint fairly alleges that SDI actively sought to avoid any transaction structure that would require the approval of TPB's stockholders. In particular, SDI's special committee presented a Third Term Sheet contemplating that any transaction would be subject approval by both SDI's stockholders and TPB's stockholders, in addition to approval by a majority of TPB's minority stockholders.[121] SDI then overrode its special committee and communicated to TPB's Special Committee that any majority of the minority vote condition was a non-starter.[122] *MFW* was designed as a narrow safe harbor for a controlling stockholder transaction to obtain business judgment review at the pleadings stage. Its protections apply even if the challenged transaction is not subject to a statutory vote under the DGCL. To accept business judgment review to a controlling stockholder transaction merely because it can be structured to avoid a

---

[121] Compl. ¶ 99.

[122] *Id.* ¶ 102.

41

statutory stockholder vote would, in my view, undermine the entire rationale for the doctrine. The Special Committee Defendants also ignore the Complaint when arguing that the rights of TPB's minority stockholders were "unaffected" by the SDI Buyout.[123] The Complaint alleges that TPB's minority stockholders were largely excluded from the economic benefit of the transaction, and that they could have secured a greater benefit than they ultimately received.[124] The Special Committee Defendants' argument also ignores the Duff & Phelps analysis that found the economic benefits of the transaction to favor the SDI stockholders over the TPB stockholders.[125]

The SDI Buyout was not conditioned on a majority-of-the-minority vote as contemplated by *MFW*. In the absence of a majority-of-the-minority vote condition, the approval of a purportedly independent special committee is not sufficient to trigger the business judgment rule. In *Kahn v. Tremont Corp.*, the Delaware Supreme Court observed that entire fairness review is still appropriate "when an

---

[123] Special Committee Defs.' Opening Br. 16 (arguing that the SDI Buyout was a "*forward triangular merger where TPB minority stockholders' rights are not affected*") (emphasis in original); *id.* at 19 ("[T]he transaction did not alter TPB minority stockholders' interests."). This argument is curious coming from the Special Committee Defendants. If TPB's minority stockholders' rights were so unaffected by the SDI Buyout that the business judgment rule should apply, what was the purpose of the Special Committee?

[124] Compl. ¶ 7.

[125] Cannataro Aff. Ex. 19 at TPB_Berteau_000358 (determining that TPB's stockholders would receive 9.9% of the transaction's economic benefit).

independent committee is utilized because the underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny." *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997); *see also MFW*, 88 A.3d at 643 (noting that the "vital distinction" between that case and *Tremont* was that "the controller did not give up its voting power by agreeing to a non-waivable majority-of-the-minority condition").

*MFW* was a narrow and carefully cleared path for defendants to follow to obtain a pleadings stage dismissal of a controlling stockholder transaction. By arguing that the *MFW* framework does not require a majority-of-the-minority vote condition when the controlled transaction is structured as a forward triangular merger, the Special Committee Defendants seek to turn that path into a highway. Delaware law requires the application of entire fairness review to the SDI Buyout.

### 2. The Complaint States a Claim that Entire Fairness Applies and that the Standard General Defendants Breached Their Fiduciary Duties.

"To survive a motion to dismiss in an entire fairness case, the plaintiff must plead facts that, with all reasonable inferences drawn in their favor, show the transaction was unfair." *Olenik v. Lodzinski*, 208 A.3d 704, 718 n.74 (Del. 2019). "Even in a self-interested transaction . . . to state a claim, a shareholder must allege some facts that tend to show the transaction was not fair." *Solomon v. Pathe*

*Commc'ns Corp.*, 1995 WL 250374, at \*5 (Del. Ch. Apr. 21, 1995)*, aff'd,* 672 A.2d 35 (Del. 1996).

The unitary test of entire fairness requires a board of directors to establish "to the court's satisfaction that the transaction was the product of both fair dealing and fair price." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Fair dealing and fair price "must be examined as a whole since the question is one of entire fairness." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Thus, the court "determines entire fairness based on all aspects of the entire transaction." *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007). Because entire fairness review requires the court to adjudicate the fact-intensive issue of fair dealing and fair price, a determination that a transaction is subject to entire fairness review "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss." *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. 2002). As the court has more recently expressed, "overcoming entire fairness is typically a Sisyphean task for defendants at the pleading stage, where the court must accept all of Plaintiffs' well-pled facts as true and draw every reasonable inference in their favor." *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at \*46 (Del. Ch. Jan. 27, 2021); *see also Salladay*, 2020 WL 954032, at \*1 (noting that it is virtually "axiomatic that, where entire fairness is the standard of review, a motion to

44

dismiss is rarely granted, because review under entire fairness requires a record to be meaningful").

The question of whether the process was fair "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Several key allegations support a reasonable inference that the SDI Buyout was not the result of an entirely fair process. In particular, the well-pleaded allegations of the Complaint support a reasonable inference that SDI and Standard General successfully interfered with the transaction process.

To establish that a controlling stockholder exercised actual control at the pleading stage, if "a plaintiff alleges facts from which one can reasonably infer that a stockholder controlled a corporation's conduct, I am to draw that inference despite the fact that the same facts also could support an inference less favorable to the plaintiff." *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 913 (Del. Ch. 1999). As a threshold matter, the Standard General Defendants argue that "the only reasonable inference is that the 1:1 [exchange] ratio" that formed the basis for the initial proposal considered by TPB "was the SDI special committee's idea."[126] But

---

[126] Standard General Defs.' Reply Br. 14.

45

no one stood to gain more than Standard General from a stock-for-stock acquisition of SDI by TPB at a 1:1 exchange ratio. According to the Complaint, Standard General owned more than 75% of the outstanding SDI Class A common stock and more than 80% of SDI outstanding nonvoting Class B common stock.[127] The last annual report filed by SDI before the SDI Buyout disclosed that, as of April 15, 2020, Standard General's "total beneficial ownership" of SDI was 81.7%, representing 6,237,143 shares of SDI's Class A common stock and 7,360,075 Class B common stock.[128] Even a rough approximation based on Duff & Phelps's analysis that SDI's stock traded at approximately 30% discount to TPB's stock indicates that executing the SDI Buyout at a 1:1 exchange ratio would have permitted Standard General itself to reap over $60 million of benefit without sharing any of that benefit with TPB's minority stockholders.[129] The position that the "only reasonable inference" is that the Standard General Defendants had no involvement in the initial 1:1 exchange ratio proposal to TPB is not credible.

---

[127] Compl. ¶ 28.

[128] SDI Form 10-K/A, at 10 (filed April 22, 2020).

[129] Cannataro Aff. Ex. 11 at TPB_Berteau_000325 (Duff & Phelps indicating that the "market implied a discount of approximately $78.5 million, or 30%, to the value of TPB shares owned by SDI"); *see also id.* Ex. 17 at TPB_Berteau_000342 (fairness opinion dated March 30, 2020, calculating the total economic benefit achieved by the SDI Buyout to be $78.5 million).

It is reasonably inferable that Standard General exercised control over the transaction process on multiple occasions after the initial proposal. On two occasions, SDI's board of directors appears to have reversed the negotiation position of SDI's special committee. The first reversal occurred between February 6 and 12, when SDI's special committee delivered the Third Term Sheet providing for a majority-of-the-minority approval by TPB's stockholders and then reversed course less than one week later, declaring that such a condition would, "under no circumstances," be acceptable to SDI. The second reversal occurred on March 24, when SDI's special committee reported the then-current terms of negotiations to the full SDI board of directors. The day before, SDI's special committee had counterproposed an exchange ratio of 0.97x, $1 million in transaction fees and expenses, and that SDI would have no more than $25,000 in net liabilities at closing.[130] SDI's directors pressed the SDI special committee as to why the terms "did not align more closely with the original 1:1 exchange ratio that had first been proposed by the SDI special committee to TPB's special committee."[131] After SDI's special committee reported to the full SDI board of directors, the special committees met and reverted to more favorable terms for Standard General and SDI: an exchange ratio of 0.99x, the payment of $500,000 in transaction fees and expenses

[130] Compl. ¶¶ 118–21; Form S-4 at 44.

[131] Compl. ¶ 122 (quoting Form S-4 at 44–45).

47

to TPB, and a limit on SDI's liabilities of no more than $25,000 at closing.[132] As Plaintiff alleges, it is a reasonable inference that these reversals were the result of Standard General's intervention in the negotiation process.[133]

The Standard General Defendants argue that allegations of Standard General's alleged interference on the SDI side of the transaction do not support a reasonable inference that Standard General affected the Special Committee process.[134] They cite no case law in support of this argument, and their position is not tenable. Standard General's propensity to interfere on the SDI side creates a pleading stage inference that it did not respect the barriers created by the creation of the TPB Special Committee. It also informs the context of the critical events of March 29.

The well-pleaded allegations of the Complaint suggest that Standard General did not limit its influence to acting through SDI.[135] The March 29, 2020 meetings support a reasonable inference that Standard General decided to end further bargaining between the special committees and to finalize approval of the SDI Buyout. The Special Committee process began in November 2019, but it effectively ended in a single weekend. After the Special Committee conveyed a refusal to a

---

[132] Form S-4 at 45.

[133] *See* Compl. ¶¶ 105 & 125.

[134] Standard General Defs.' Opening Br. 11–14.

[135] *See* Compl. ¶¶ 134–36 (alleging that "Standard General engineered the Special Committee's 'opportunity to update' the Board to exert pressure on the Special Committee").

0.99x exchange ratio on a Saturday, the Form S-4 reflects that all parties involved engaged in negotiations, including "in consultation respectively with members of the full boards of each company."[136] The Form S-4 does not explain why the Special Committee was discussing the transaction with other members of TPB's board of directors.

The following morning, on Sunday, March 29, 2020, there were three meetings—first between the special committees, then between the SDI board of directors and SDI's special committee, and then between TPB's board of directors and TPB's Special Committee. These meetings have a choreographed and unusually hurried nature. There is no indication in the Form S-4 or the Special Committee record as to why the Special Committee would have wanted to urgently conclude negotiations. In the absence of any other explanation, it is a reasonable inference that these meetings were conducted at the behest of the common controller of SDI and TPB: Standard General. *See McMullin v. Beran*, 762 A.2d 910, 922 (Del. 2000) ("The imposition of time constraints on a board's decision-making process may compromise the integrity of its deliberative process.").

Defendants protest that the March 29 TPB Meeting minutes state that the purpose of the meeting was merely for an "update" regarding the transaction. As

---

[136] Form S-4 at 45.

49

Plaintiff observes, there is no indication in the March 29 TPB Meeting minutes or in any minutes of any Special Committee meetings that the Special Committee had requested to update TPB's board of directors. In fact, as the March 29 TPB Meeting minutes indicate, Hebard "noted that she was not requesting any action by the Board at this meeting."[137] In that regard, it is hard to comprehend why an "update" would have been helpful or appropriate for three of the seven TPB directors: SDI's special committee had discussed the same proposal earlier the same morning with SDI's full board of directors, including Glazek, Baxter, and Zimmerman. Even if the court could draw inferences in favor of Defendants (which it cannot), the minutes and circumstances of the March 29 TPB Meeting do not render Defendants' protestations that the meeting was a mere update and "nothing sinister" the only credible inference.[138] On the contrary, it is a reasonable inference that the three meetings on the morning of March 29, 2020 were designed to end further bargaining by the Special Committee.

The meeting minutes further reinforce the inference that the March 29 TPB Meeting was an occasion for Standard General to make itself heard. The minutes reflect that the dual fiduciaries, Glazek, Baxter, and Zimmerman, participated in substantive discussions regarding the terms of the merger. Glazek is a partner at

[137] Cannataro Aff. Ex. 15.
[138] Director Defs.' Opening Br. 20 n.69.

Standard General whose responsibilities include "helping companies that Standard General controls or influences" with "transactional" issues.[139] He was the primary speaker at the March 29 TPB Meeting other than Hebard, and he "reviewed reasons for the potential transaction from both the TPB and the SDI perspective."[140] Given these facts, it is a reasonable inference that Glazek acted on behalf of Standard General at the March 29 TPB Meeting, and that he did not limit himself to speaking on behalf of SDI and TPB. After Glazek spoke and the full TPB board discussed substantive merger issues including "the risks and potential costs of litigation," Glazek, Zimmerman, and Baxter excused themselves for fifteen minutes for unexplained reasons.[141] Wexler and Diao then took up discussing the merger terms with the Special Committee until Glazek, Zimmerman, and Baxter returned.[142]

Most significant is that the March 29 TPB Meeting marked the end of price negotiations between SDI and TPB. There is no indication from the Form S-4 or the minutes of any meeting of the Special Committee that the Special Committee had viewed the terms negotiated as early as that morning as final or near-final. There is no record of a Special Committee meeting discussing the proposed 0.97x exchange ratio before the Special Committee presented that proposal to the full board at the

---

[139] Form S-4 at 92.

[140] Cannataro Aff. Ex. 15 at TPB_Berteau_000281.

[141] *Id.*

[142] *Id.*

March 29 TPB Meeting. And the minutes of the March 29 TPB Meeting indicate that the Special Committee had not yet received a fairness opinion from Duff & Phelps. Yet after March 29, 2020, there was no further movement regarding the price for the SDI Buyout. Under Delaware law, a controlling stockholder has been analogized to an "800-pound gorilla."[143] Because there were no further negotiations regarding merger price after Glazek and the other conflicted directors weighed in, it is a reasonable inference that the purpose of the March 29 TPB Meeting was to deliver an unmistakable message from the gorilla to stop negotiating and sign the deal.[144]

The Complaint contains well-pleaded allegations that the unfair process resulted in an unfair price. The question of "fair price" concerns "the economic and

[143] *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) ("In colloquial terms, the Supreme Court saw the controlling stockholder as the 800–pound gorilla whose urgent hunger for the rest of the bananas is likely to frighten less powerful primates like putatively independent directors who might well have been hand-picked by the gorilla (and who at the very least owed their seats on the board to his support).").

[144] The Standard General Defendants argue that it is not a reasonable inference that Standard General was responsible for calling the March 29, 2020 meeting because TPB's bylaws require its CEO or TPB's board of directors to call the meeting, and the bylaws do not empower Glazek alone to call the meeting. Hr'g Tr. 86:24-87:5. The circumstances of the meeting and the two other meetings that morning—one involving the SDI board and its special committee—suggest that it was an event designed to end the special committee process. It is a reasonable inference from the facts alleged that Standard General was responsible for calling the March 29 TPB Meeting, regardless of whether it occurred through Wexler alone or through a combination of other conflicted directors. That inference is reasonably drawn from the well-pleaded allegations of the Complaint, and it is one that I must credit in Plaintiff's favor on a motion to dismiss.

financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711. The Complaint and the Duff & Phelps presentations incorporated therein indicate that SDI directly competed with TPB's other stockholders over the economic benefit to be achieved by the SDI Buyout.[145] According to Plaintiff, the SDI Buyout was unfair with respect to price because the 0.97x exchange ratio transferred approximately 90% of the economic benefit derived from the transaction to SDI rather than to TPB's stockholders.[146] The Complaint alleges that the Special Committee never considered an alternative transaction or an alternative form of

---

[145] Defendants argue that the SDI Buyout was not "zero-sum" because it purportedly "provided unique and meaningful upside to both parties by eliminating inefficiencies." Director Defs.' Opening Br. 4; *see also* Special Committee Defs.' Opening Br. 41–42 (listing inefficiencies purportedly eliminated by the SDI Buyout and arguing that the transaction was entirely fair because the SDI Buyout benefited TPB stockholders). Even assuming that the SDI Buyout was not zero-sum in some respects because it eliminated inefficiencies and thereby benefited both TPB and SDI, the exchange ratio was the central component of the SDI Buyout and the exchange ratio presented a zero-sum situation: a more favorable exchange ratio to SDI inured to TPB's detriment and vice versa. *See Zero-Sum Game*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining zero-sum game as "[a] situation in which a gain for one side necessarily entails an equal and opposite loss on the other side"). As described herein, the Complaint adequately pleads that the ultimate 0.97x exchange ratio enabled SDI to extract benefits from the transaction not shared with TPB's stockholders on a *pro rata* basis.

[146] Compl. ¶ 111 ("[A]t a 3% discount, or a 0.97x exchange ratio, the chart shows that $6.8 million of the deal's $78.5 million overall financial benefit – or 9.9% – would flow to TPB stockholders.").

merger consideration.[147]  With respect to the exchange ratio, it is a reasonable inference from the Duff & Phelps presentations that the Special Committee could have obtained more for TPB and its stockholders.[148]

The Director Defendants argue that Plaintiff has not pleaded facts sufficient to warrant application of entire fairness review and argue that *Monroe County Employees' Retirement System v. Carlson* supports dismissal of this action.  In *Monroe County Employees' Retirement System v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010), the dismissed complaint contained only conclusory allegations that the transaction resulted in an unfair price.  *Carlson* is distinguishable because the Complaint contains well-pleaded allegations that TPB and its stockholders could have secured a greater portion of the economic benefit derived from the SDI Buyout.  Here, the Complaint contains well-pleaded allegations of both unfair process and unfair price, and Plaintiff has met his burden to plead entire fairness.  Because it is a reasonable inference that the Standard General Defendants acted to unfairly shut down the Special Committee process, the Standard General Defendants' motion to dismiss pursuant to Rule 12(b)(6) is denied.

---

[147] *Id.* ¶¶ 6, 85.

[148] *See, e.g.*, Cannataro Aff. Ex. 11 at TPB_Berteau_000325 (indicating that, at a 15% discount to a 1:1 exchange, TPB's stockholders would have obtained a similar benefit to SDI).

### 3. The Complaint States a Claim that Most of the Director Defendants and the Special Committee Defendants Breached Their Fiduciary Duties.

Entire fairness review of the transaction does not ineluctably lead to the denial of the directors' motions to dismiss. The Director Defendants and Special Committee Defendants are protected by an exculpatory charter provision pursuant to 8 *Del. C.* § 102(b)(7),[149] and they argue that no non-exculpated claim for breach of fiduciary duty has been stated against them.

"When the independent directors are protected by an exculpatory charter provision and the plaintiffs are unable to plead a non-exculpated claim against them, those directors are entitled to have the claims against them dismissed." *In re Cornerstone Therapeutics, Inc. S'holder Litig.*, 115 A.3d 1173, 1176 (Del. 2015). As the Delaware Supreme Court held in *Cornerstone*, "each director has a right to be considered individually when the directors face claims for damages in a suit challenging board action," and Delaware law "refuse[s] to presume that an independent director is not entitled to the protection of the business judgment rule solely because the controlling stockholder may itself be subject to liability for breach of the duty of loyalty if the transaction was not entirely fair to the minority stockholders." *Id.* at 1182–83. Thus, to state a claim for breach of fiduciary duty

---

[149] *See* Cannataro Aff. Ex. 21 Art. X. Plaintiff does not contest that the TPB certificate contains an exculpatory provision pursuant to 8 *Del. C.* § 102(b)(7), and the court can take judicial notice of the charter attached to the Cannataro Affidavit.

55

against a director, a plaintiff must plead "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." *Id.* at 1179–80. In an entire fairness case, "a director seeking to rely on the exculpatory provision must show that any liability . . . is 'exclusively attributable to a violation of the duty of care.'" *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1164 (Del. Ch. 2006) (quoting *In re Emerging Commc'ns S'holders Litig.*, 2004 WL 1305745, at *40 (Del. Ch. May 3, 2004)).

### i.      Glazek, Baxter, and Zimmerman

Glazek, Baxter, and Zimmerman are paradigmatic dual fiduciaries. Each served on the board of directors of SDI as well as the board of directors of TPB.[150] Glazek is a partner of Standard General.[151] Baxter was SDI's CEO before the SDI Buyout.[152] "There is no 'safe harbor' for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger*, 457 A.2d at 710.

---

[150] Compl. ¶¶ 18, 20, 24.

[151] *Id.* ¶ 18.

[152] *Id.* ¶ 20.

56

The purpose of the Special Committee, as stated at its formation, was to insulate the transaction process from the influence of Glazek, Zimmerman, and Baxter.[153] The Complaint pleads facts showing that they did not respect the line in the sand. At the March 29 TPB Meeting, after Hebard discussed the Special Committee process, Glazek took center stage and spoke at length regarding "reasons for the potential transaction from both the TPB and the SDI perspective," including substantive deal terms.[154] The minutes suggest Glazek, Zimmerman, and Baxter acted as a bloc at that meeting as SDI directors because they simultaneously excused themselves from the meeting for fifteen minutes to permit Wexler and Diao to speak privately with the Special Committee.[155] The portrayal of the March 29 TPB Meeting as just an update in the TPB board minutes—and reiterated in Defendants' briefing—is not the only reasonable inference to be drawn from the facts alleged in the Complaint. SDI's board of directors had discussed the latest deal terms with SDI's special committee that same morning.[156] It is a reasonable inference that the

---

[153] Cannataro Aff. Ex. 2 at TPB_Berteau_000277.

[154] *Id.* Ex. 15 at TPB_Berteau_000281.

[155] *Id.*

[156] Form S-4 at 45 (stating that, prior to the March 29 TPB Meeting, "the SDI Board held a meeting at which the SDI special committee relayed the terms discussed with the TPB special committee earlier in the day. The SDI Board indicated to the SDI special committee that it could support a transaction consistent with these terms subject to satisfactory negotiation of definitive documents and continued discussions between the SDI special committee and its advisors.").

intended effect of the March 29 TPB Meeting was to dominate the Special Committee to benefit Standard General and SDI. The exchange ratio did not change after that meeting, and the Special Committee only met twice thereafter to conclude the process. In short, the Complaint contains well-pleaded facts that Glazek, Baxter, and Zimmerman "harbored self-interest adverse to the stockholders' interests" and "acted to advance the self-interest" of SDI and Standard General. *Cornerstone*, 115 A.3d at 1180. As a result, the Complaint states a non-exculpated claim for breach of the duty of loyalty against Glazek, Baxter, and Zimmerman.

### ii. Wexler

Wexler has been a director and TPB's President and Chief Executive Officer since 2009.[157] "Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller." *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016) (collecting cases). SDI controlled Wexler's compensation: Glazek and Zimmerman served on TPB's three-person Compensation Committee.[158] Defendants do not contest that Wexler's compensation as the Chief Executive Officer of TPB was material to him. It is therefore a reasonable inference that Wexler "harbored self-interest adverse to the

---

[157] Compl. ¶ 19.

[158] Compl. ¶¶ 18, 25.

58

stockholders' interests," and that he would act in favor of the controller rather than TPB. *Cornerstone*, 115 A.3d at 1180.[159]

The Complaint and the documents incorporated by reference therein support a reasonable inference that Wexler acted on behalf of Standard General during the Special Committee process. In particular, it is a reasonable inference that Wexler convened[160] and participated in the March 29 TPB Meeting, an event seemingly designed to provide conflicted fiduciaries a formal opportunity to weigh in and cut off further negotiations between the special committees regarding the exchange ratio.

The Director Defendants argue that "Wexler's status as TPB's CEO alone is not enough to defeat exculpation." Director Defs.' Opening Br. 62 (citing *Hamilton Partners, L.P. v. Highland Capital Management, L.P.*, 2014 WL 1813340 (Del. Ch. May 7, 2014)). *Hamilton Partners* is distinguishable. In *Hamilton Partners*, the court evaluated a transaction in which a plaintiff alleged that a CEO was involved at two points during a special committee process, first by involving himself in an initial

---

[159] The Director Defendants argue that the Complaint does not allege that Wexler took any action in his capacity as an officer. Because the Complaint states a non-exculpated claim for a breach of the fiduciary duty of loyalty against Wexler in his capacity as a director, I need not address this issue.

[160] The record is not entirely clear on this point. The meeting minutes state that the meeting was called pursuant to the bylaws. The bylaws provide that special meetings of the board can be called by the CEO or a majority of the board. There is at least a reasonable pleadings-stage inference that Wexler called the meeting at the request of Glazek, Baxter, and Zimmerman—the three conflicted SDI directors.

59

counterproposal and then a proposing a self-tender offer. *Id.* at *3. The court held that there was no well-pleaded allegation indicating that the CEO acted to "sterilize" or "compromise" the business judgment of the special committee. *Id.* at *16. The allegations that Wexler convened and participated in the March 29 TPB Meeting are much more significant than the "generalized allegations" made in *Hamilton Partners*. The Complaint states a non-exculpated claim for breach of the fiduciary duty of loyalty against Wexler.

### iii. Diao

Directors are "considered individually when the directors face claims for damages in a suit challenging board action," and "applying the entire fairness standard against interested parties does not relieve plaintiffs seeking damages of the obligation to plead non-exculpated claims against each of the defendant directors." *Cornerstone*, 115 A.3d at 1181–82. This requirement is founded on the presumption that directors are faithful to their fiduciary duties. *Beam v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). The Delaware Supreme Court, however, has indicated that the court should not "parse elements" relating to independence and conflict as "categorically distinct." *Delaware County Employees Retirement Fund v. Sanchez*, 124 A.3d 1017, 1021 (Del. 2015).

The Complaint's allegations against Diao do not support a non-exculpated claim against him. Diao serves as Standard General's designee on the TPB board of

directors.[161] The Complaint alleges that, "[a]ccording to press reports," Diao and Kim "have known each other and have been friends and business associates since at least 2004," and the founder of Standard General and Diao served together on the board of a publicly traded company.[162] On November 15, 2019, Diao recused himself from serving on the Special Committee, citing his "immaterial" holdings of SDI stock, which amounted to 15,000 shares of SDI's Class A common stock.[163] Diao attended the March 29 TPB Meeting, but the minutes lack any specificity regarding the nature of his involvement.

These allegations do not demonstrate that Diao was not disinterested and independent. Diao's mere status as Standard General's designee does not mean he is not independent. *Rudd v. Brown*, 2020 WL 5494526, at *12 (Del. Ch. 2020) ("Delaware law is clear that a director's independence is not compromised by virtue of his status as a stockholder appointee."). The allegations of Diao's relationship with Kim are minimal. The Complaint alleges that, based on an unidentified press report, "the 63-year-old Diao and 45-year-old Kim have known each other and have been friends and business associates since at least 2004," and that they have served together on the board of directors for a company named Media General, Inc. "for

---

[161] Compl. ¶ 17.

[162] *Id.* ¶ 21.

[163] Cannataro Aff. Ex. 2 at TPB_Berteau_000277.

several years."[164] These allegations are analogous to the allegations in *Beam*, in which the Delaware Supreme Court determined that allegations that directors "moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,'" were not sufficient to overcome the presumption that directors are disinterested and independent. *See Beam*, 845 A.2d at 1051; *see also id.* at 1054 (considering facts including "a *Fortune* magazine article focusing on . . . close personal relationships").

Diao's economic interest in SDI and his recusal from serving on the Special Committee do not support a claim that he breached his fiduciary duty of loyalty. Indeed, Plaintiff does not argue that Diao's economic interest in SDI—15,000 shares of SDI Class A common stock—supports a reasonable inference that Diao could not have acted against SDI's interests.[165] In fact, Plaintiff concedes that Diao's ownership of shares in 15,000 SDI was "immaterial."[166] Plaintiff instead argues that, because Diao's recusal from serving on the Special Committee was based on immaterial stock ownership, "it is reasonable to infer that [Diao] would act to protect his relationship with [Kim] and Standard General over his reputation as a public

---

[164] Compl. ¶ 21.

[165] *See* Pl.'s Answering Br. 50–52.

[166] Hr'g Tr. 70:7–9. ("But the bottom line with respect to Mr. Diao is that when he had an opportunity to negotiate against Standard General, he declined for an immaterial reason.").

company director," including by participating in the March 29 TPB Meeting.[167]
These allegations amount to speculation. It is not a reasonable inference that Diao's recusal was a pretext because Plaintiff has supplied no allegation indicating that Diao was otherwise not independent. And because the Complaint lacks any well-pleaded allegations supporting a reasonable inference that Diao was beholden to Standard General or SDI, Diao's mere presence at the March 29 TPB Meeting is not sufficient to support a non-exculpated claim against him.

Because the Complaint does not contain any well-pleaded allegation supporting a reasonable inference that Diao had any self-interest adverse to TPB, acted to advance the interest of SDI, or acted in bad faith, the motion to dismiss must be granted with respect to Diao. *Cornerstone*, 115 A.3d at 1180.

### iv. The Special Committee Defendants: Frushone and Hebard

The individualized determinations required under *Cornerstone* are crucial when analyzing whether a claim has been stated against independent directors. "[T]o require independent directors to remain as defendants solely because the plaintiffs stated a non-exculpated claim against the controller and its affiliates would be inconsistent with Delaware law and would also increase costs for disinterested directors, corporations, and stockholders, without providing a corresponding

---

[167] Hr'g Tr. 70:14–17.

benefit." *Cornerstone*, 115 A.3d at 1182. "[W]hen a complaint pleads facts creating an inference that seemingly independent directors . . . may have breached their duty of loyalty," however, "the pro-plaintiff inferences that must be drawn on a motion to dismiss" may require "resolution of [any] question of fact only after discovery." *Id.* at 1186–87. To evaluate whether a complaint states a claim against purportedly independent directors, the court considers whether such directors have been "dominated in [their] decision-making by a controlling stockholder, resulting in directors that are more independent in appearance than in substance." *CBS Corp.*, 2021 WL 268779, at *41 (internal quotations omitted). In that analysis, the court will look to whether the special committee members "evidenced [an] inability to push back against the asserted will of the controller." *Id.*

According to the well-pleaded facts in the Complaint and drawing all reasonable inferences in Plaintiff's favor, the Complaint states a non-exculpated claim against the Special Committee Defendants. The Complaint pleads facts creating a reasonable inference that TPB management selected the Special Committee's counsel. Plaintiff alleges that Lathrop was invited to the November 15, 2019 board meeting[168] and "advised the Board concerning the formation of a special committee, before that committee existed" and then began advising the

---

[168] Compl. ¶ 66.

64

Special Committee immediately after its formation.[169] After the Special Committee process ended, Lathrop reverted to its former role and advised the Company as its "transactional counsel in the SDI Buyout."[170] Based on these allegations, Plaintiff alleges that it is a reasonable inference that "TPB management chose Lathrop as the Special Committee's counsel," and that Lathrop's influence was a potential conflict of interest.[171] I agree. The minutes are devoid of any reliable indication as to when or if the Special Committee formally retained Lathrop, or that the Special Committee considered any potential conflicts held by Lathrop.[172] Lathrop was also centrally involved in the process as the Special Committee's primary legal advisor and negotiator with the SDI special committee.[173]

The Complaint supports a reasonable inference that the Special Committee was not prepared to exercise its ability to say "no" to the controller. In particular, the Special Committee never sought to leverage SDI's reversal of position regarding majority-of-the-minority approval by TPB's stockholders. In *CBS Corp.*, this court described the failure of a special committee to "attempt to secure" a majority-of-the-

---

[169] *Id.* ¶¶ 67–70.

[170] *Id.* ¶ 67.

[171] *Id.* ¶ 70.

[172] The March 29 TPB Meeting minutes state that the Special Committee "chose Lathrop . . . as legal counsel along with Blank Rome LLP as its special Delaware counsel" and "engaged Duff & Phelps." Cannataro Aff. Ex. 15.

[173] *See* Form S-4 at 42–46.

minority vote after a controller "signaled it would not agree to that condition" as "inexplicable." *CBS Corp.*, 2021 WL 268779, at *40. A similar situation occurred here. The SDI special committee's Third Term Sheet included terms requiring approval by TPB's stockholders and SDI's stockholders, as well as by a majority of TPB's minority stockholders.[174] SDI's special committee then reversed course, stating that "under no circumstances would SDI proceed" if the transaction were conditioned on approval of a majority of TPB's minority stockholders.[175] The Special Committee discussed this reversal with its legal advisors at its February 18, 2020 meeting for a total of 45 minutes. Even before meeting with its financial advisor, the Special Committee determined that the benefits of the transaction outweighed the benefits of a majority-of-the-minority vote.[176] It is a reasonable inference that the Special Committee understood this reversal to be a signal from the controller, as in *CBS Corp.*, and the failure to negotiate in any meaningful way regarding this key procedural protection is indicative of a Special Committee that could not "push back against the asserted will of the controller." *CBS Corp.*, 2021 WL 268779, at *41.[177]

---

[174] *Id.* at 43.

[175] Cannataro Aff. Ex. 12.

[176] *Id.*

[177] *See Voigt v. Metcalf*, 2020 WL 614999, at *26 (Del. Ch. Feb. 10, 2020) ("The facts alleged need only support a litigable inference of disloyalty or bad faith. The inference

The portrayal of the proposed majority-of-the-minority vote and its rejection in the Form S-4 does not inspire confidence that the Special Committee was willing or able to push back on the controller. *See* Form S-4 at 43 (disclosing that "though the parties and their respective counsel discussed this provision on several occasions, this proposed condition became inapplicable once the parties determined that the approval of TPB stockholders was not required for the consummation of the merger"). Thus, the Special Committee's failure to insist on a majority-of-the-minority vote appears to be inexplicable, and the documentation of that failure seems to have been deliberately vague.

The March 29 TPB Meeting is critical to the analysis of the Special Committee Defendants' conduct. It was a meeting between the Special Committee and openly conflicted TPB directors that marked the end of negotiations regarding the exchange ratio after that date. There is no indication that either member of the Special Committee objected to a meeting with the conflicted directors. There is no indication that the Special Committee resisted Standard General's pressure to close price negotiations over a single weekend. And, as described above, the Special Committee process effectively ended after the March 29 TPB Meeting. These facts render this case similar to *CBS*. In *CBS*, the court found that members of a special

_____

need not be the only possible inference, nor even the most likely inference. The inference need only be reasonably conceivable.") (internal citation omitted).

committee faced a substantial likelihood of liability for breach of the duty of loyalty partly because of what the special committee failed to do after persistent interference by a controller. *Id.* at \*37–43. Though Standard General's interference does not appear to have been as persistent as in *CBS*, the choreographed March 29 TPB Meeting was no less consequential, and it renders the conclusion in *CBS* applicable here: "By remaining silent under these unique set of facts, it is reasonable to infer that each of these directors' ostrich-politik violated their duty of loyalty." *Id.* at \*42. In fact, the Complaint pleads that the Special Committee never lifted its head from the sand: after the March 29 TPB Meeting, the Special Committee never sought to hold SDI accountable for a public offering that breached the Merger Agreement and that appears to have profited Standard General-affiliated funds at TPB's expense.[178]

The Special Committee Defendants argue that the Complaint does not allege that they acted with a "conscious disregard" for their fiduciary duties or that they "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005). In support of this argument, the Special Committee Defendants argue that their negotiations reflect acts of good faith. According to the Special Committee

---

[178] Compl. ¶ 186; *see* Merger Agreement at A-19. In their briefing, the Director Defendants argue that the offering was subject to a waiver agreement that is "not before the Court." Director Defs.' Opening Br. 43 n.137. Because the waiver agreement referenced by the Director Defendants is concededly not properly before the court, it can have no effect on this Opinion.

Defendants, they engaged legal and financial advisors, met ten times between November 25, 2019 and April 7, 2020, made presentations to the full TPB Board about the transaction twice, obtained a fairness opinion, and engaged in negotiations with SDI that ultimately moved the exchange ratio. The fact that the Special Committee Defendants engaged in negotiations prior to March 29, 2020 cannot immunize the Special Committee Defendants from well-pleaded facts supporting a reasonable inference that they ceased negotiations in conscious disregard of their fiduciary duties after the March 29 TPB Meeting. *See In re Pattern Energy Group Inc. S'holders Litig.*, 2021 WL 1812674, at *50 (Del. Ch. May 6, 2021) (holding that a complaint stated a non-exculpated claim against directors because, even though "the Special Committee worked to extract value . . . on multiple occasions" for "over one year," the complaint alleged that "with each reasonable and measured step forward . . . the Director Defendants took two steps back.").

Viewing the facts in their totality, the allegations of the Complaint and the documents incorporated by reference therein plead a non-exculpated claim against the Special Committee. Plaintiff's allegations support a reasonable inference that negotiations over deal terms were limited to the minimum necessary to confer a scintilla of legitimacy to the Special Committee process, and that the Special Committee abdicated their fiduciary duties after the March 29 TPB Meeting. *See In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *24 (Del. Ch. Dec. 29, 2020)

69

(denying a motion to dismiss because a committee's "negotiations reflect a desire to placate the controller, not to land the best transaction possible" for all stockholders); *cf. In re InfoUSA, Inc.*, 2007 WL 3325921, at \*23 (Del. Ch. Aug. 13, 2007) (denying a motion to dismiss on behalf of all directors, including members of a special committee who had taken "their mandate seriously" and "bared its teeth" in negotiations against a controller before the non-committee members voted to disband the committee). Frushone and Hebard may eventually prove that they acted loyally to TPB, conducted a fair process, and did not acquiesce to the influence of Standard General. That conclusion cannot be reached as a matter of law at this preliminary stage.[179] For the foregoing reasons, the Complaint states non-exculpated

---

[179] Defendants raise a number of factual arguments that the court cannot accept at this stage because doing so would require impermissibly drawing inferences in favor of the Defendants. When there is more than one reasonable inference to be drawn from the factual allegations at the pleadings stage, "Plaintiffs get the reasonable inferences, not Defendants." *In re CBS Corp*, 2021 WL 268779, at \*31 n.450. As important, careful scrutiny of the record relied upon by Defendants reveals that it is replete with gaps, inconsistencies, and the use of passive voice seemingly designed to avoid describing certain important events and identifying decisionmakers and speakers. *See* Form S-4 at 43 (representing that "the parties and their respective counsel determined" that a majority-of-the-minority vote "became inapplicable" after they concluded "the approval of TPB stockholders was not required for the consummation of the merger"). The Form S-4 and the minutes of the meetings of the Special Committee do not undermine the inferences that I draw in Plaintiff's favor. *See* Michael A. Pittenger, Janine M. Salomone, Pamela L. Millard, Ryan T. Costa, & Jacqueline A. Rogers, *M&A Deal Counsel's Role In Creating a Winning Written Record for Defending Breach of Fiduciary Duty Litigation*, 2013 Section of Business Law Spring Meeting 31 (2013) ("Delaware case law is replete with examples of situations in which the contemporaneous written record of board or committee deliberations inspires judicial confidence in the decision-making process, but also many examples of cases in which a thin, sketchy, or inconsistent written record undermines the defendants' litigation posture."); *see also* Leo E. Strine, Jr*., Documenting the Deal: How*

claims for breach of fiduciary duty against Wexler, Glazek, Zimmerman, Baxter, Frushone, and Hebard.

## B.    Defendants' Motion to Dismiss Pursuant to Rule 23.1

Section 141(a) of the Delaware General Corporation Law provides that a corporation "shall be managed by or under the direction" of its board of directors. 8 *Del. C.* § 141(a).  This managerial authority encompasses the ability to determine whether to "initiate, or refrain from entering, litigation."  *Zapata Corp. v. Maldonado*, 430 A.2d 779 A.2d 779, 782 (Del. 1981).  Through derivative litigation, a stockholder may attempt to assert a claim on behalf of a corporation.  To do so without the board of director's consent, the stockholder must demonstrate that "the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so," or that "demand is excused because the directors are incapable of making an impartial decision regarding the litigation." *United Food & Com. Workers Union v. Zuckerberg*, 2020 WL 6266162, at *8 (Del. Ch. Oct. 26, 2020).

---

*Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone,* 70 Bus. Law. 679, 698 (2015) (explaining that an "incoherent approach to minute-taking," including "disparities in the amount of space given to various topics," can be favorable to a plaintiff).  It remains possible that Defendants could prove that the process leading to the SDI Buyout was entirely fair and free of coercion, but that record does not exist now.

Plaintiff has not made any demand on TPB's board of directors to institute litigation against Defendants.[180] Under such circumstances, Court of Chancery Rule 23.1 requires Plaintiff to "plead with particularity facts showing that a demand on the board would have been futile." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing Ch. Ct. R. 23.1(a)). "To determine whether a board of directors could properly consider a demand, a court counts heads. If the board lacks a majority of directors who could exercise independent and disinterested judgment regarding a demand, then demand is futile." *Zuckerberg*, 2020 WL 6266162, at *7 (internal citations omitted). The standard for demand futility is "well balanced, requiring that the plaintiff plead facts with particularity, but also requiring that this Court draw all reasonable inferences in the plaintiff's favor." *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019).

### 1.    The Demand Futility Test

Under Delaware law, two tests exist to determine whether a plaintiff has sufficiently pleaded demand futility. The first demand futility test, set forth in *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), requires the Court of Chancery, "in the proper exercise of its discretion" to decide "under the particularized facts alleged"

---

[180] Compl. ¶ 170.

whether (1) there is a "reasonable doubt" that either "the directors are disinterested and independent" or (2) "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.*; *see also Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). "[T]he entire review is factual in nature," but "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Aronson*, 473 A.2d at 815.

The second demand futility test is set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). In *Rales*, the Delaware Supreme Court articulated a broader test requiring the Court of Chancery to determine "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934. In *Rales*, the Delaware Supreme Court noted that "a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit." *Id.* at 927.

The parties differ on whether *Aronson* or *Rales* is the proper test to assess demand futility. Plaintiff, the Director Defendants, and the Special Committee Defendants apply *Aronson*, because the same board of directors that approved the

73

SDI Buyout would have considered a litigation demand at the time Plaintiff filed his Complaint.[181]  The Standard General Defendants are alone in arguing that *Rales* applies, though they acknowledge that *Aronson* and *Rales* "'address the same question.'"[182]  The Standard General Defendants argue that the Court of Chancery must apply the demand futility test on a claim-by-claim basis, and that because Count I is not a claim against the directors, *Rales* applies.  The Standard General Defendants therefore urge the court to apply *Rales* to Count I (alleging breach of fiduciary duty against the Standard General Defendants) and *Aronson* to Count II (alleging breach of fiduciary duty against the other Defendants).

In this case, the board that made the challenged business decision is the same board that would be evaluating the litigation demand.  Even though *Aronson* would seem to apply, recent decisions have cautioned against rote application of *Aronson*, especially in the entire fairness context.  In *Zuckerberg*, Vice Chancellor Laster explained that evolutions in Delaware law have in turn required evolutions in *Aronson*'s application.  In particular, the Delaware Supreme Court's decision in *Cornerstone* "sapped any continuing vitality from *Aronson*'s use of the standard of

---

[181] *See* Director Defs.' Opening Br. 46 (applying the *Aronson* test but noting that *Aronson* and *Rales* "provide essentially identical inquiries."); Special Committee Defs.' Opening Br. 43–46 (applying *Aronson*); Plaintiff's Answering Br. 43–54 (applying *Aronson*).

[182] Standard General Defs.' Opening Br. 4 (quoting *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017)).

review for the challenged decision as a proxy for whether directors face a substantial likelihood of liability sufficient to render demand futile." *Zuckerberg*, 2020 WL 6266162, at \*15. Thus, after *Cornerstone*, Delaware decisions have required both that "a standard more onerous" than the business judgment rule apply and that a majority of directors face a "substantial likelihood of liability on a non-exculpated claim." *Id.*; *see also id.* at \*16 ("The foundational premise of [*Aronson*], which relied on the standard of review for the challenged decision as a proxy for whether directors face a substantial likelihood of liability, no longer endures."). Those concerns apply here: straightforward application of *Aronson* would equate to a finding of demand futility merely because the SDI Buyout is subject to entire fairness, which would be inconsistent with the Delaware Supreme Court's opinion in *Cornerstone*. *See id.* at \*14.

The most thorough approach therefore requires analysis under both *Aronson* and *Rales*. Rather than examining each prong of *Aronson* and then *Rales*, however, *Zuckerberg* distills key questions necessary to resolve demand futility under both tests. *See id.* at \*19; *cf. Gottlieb v. Duskin*, 2020 WL 6821613, at \*5 (Del. Ch. Nov 20, 2020) (analyzing demand futility by considering "general principles of demand futility articulated by this Court under *Aronson* and its progeny, while keeping in mind *Rales*'s broader inquiry"). To do so, Vice Chancellor Laster proceeded by considering three inquiries:

Rather than trifurcating the analysis into a first prong of *Aronson*, a second prong of *Aronson*, and *Rales*, this decision proceeds on a director-by-director basis, asking for each director

(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand,

(ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand, and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Zuckerberg*, 2020 WL 6266162, at \*19 (formatting added). I find the approach in *Zuckerberg* appropriate to deploy in this action because answering the three-part inquiry resolves the tests set forth in *Aronson* and *Rales*.

### i. Glazek

Standard General received a material benefit from the SDI Buyout. Glazek is a Partner of Standard General, and it is a reasonable inference he lacks independence from Standard General.[183] His responsibilities at Standard General specifically include helping "companies that Standard General controls or influences" regarding "operational, transaction and financing needs."[184] The Complaint pleads facts

---

[183] Compl. ¶ 18.

[184] Form S-4 at 92.

76

supporting a reason to doubt that Glazek could exercise disinterested and independent judgment regarding a demand. Defendants do not argue that Glazek can exercise his independent business judgment in considering a demand.[185]

Beyond lack of independence, Glazek faces a substantial likelihood of liability. To show that a director faces a substantial likelihood of liability at the pleadings stage, the plaintiff "must plead particularized facts providing a reason to believe that the individual director was self-interested, beholden to an interested party, or acted in bad faith." *Zuckerberg*, 2020 WL 6266162, at \*15. The standard requires only that the plaintiff "make a threshold showing, though the allegations of particularized facts, that their claims have some merit." *Id*. at \*16 (internal quotations omitted). Because the Complaint pleads facts supporting a reasonable inference that he acted in bad faith by intentionally ending price negotiations at the March 29 TPB Meeting. *Id.* at \*15 (demand excused under the second prong of *Aronson* where entire fairness applies and a "majority of the directors face a substantial likelihood of liability on a non-exculpated claim").

Demand is excused as to Glazek.

---

[185] *See* Director Defs.' Opening Br. 47–55; Standard General Defs.' Opening Br. 6–8.

77

### ii.    Zimmerman, Baxter, and Wexler

Before the SDI Buyout, Zimmerman and Baxter were directors of SDI, and Baxter was SDI's Chief Executive Officer.[186]  Wexler is a director on TPB's board of directors and is TPB's CEO and President.[187]   According to Defendants, Zimmerman, Baxter, and Wexler are capable of evaluating a litigation demand in an independent and disinterested manner because, at the time the Complaint was filed, SDI had ceased to exist and Standard General only held 33.5% of TPB's stock.[188]

Under both *Rales* and *Aronson*, this court must determine whether the particularized allegations of the complaint generate a "reasonable doubt" that a board of directors can exercise "its independent and disinterested business judgment in responding to a demand" at the "time the complaint is filed." *Rales*, 634 A.2d at 934; *see also Aronson*, 473 A.2d at 810 ("[F]utility is gauged by the circumstances existing at the commencement of a derivative suit.").  Under certain circumstances, it is conceivable that directors who were previously dual fiduciaries could later be found to be capable of exercising disinterested and independent business judgment in considering a litigation demand asserting claims against themselves and their

---

[186] Compl. ¶¶ 20, 24.

[187] *Id.* ¶ 19.

[188] *Id.* ¶ 12.

former controller. Under these circumstances, such an argument carries only theoretical force.

Plaintiff pleads facts sufficient to raise a reasonable doubt that Zimmerman, Baxter, and Wexler were independent of Standard General at the time the Complaint was filed. To assess control, the court "must holistically evaluate sources of influences and authority, as 'different sources of influence that would not support an inference of control if held in isolation may, in the aggregate, support an inference of control.'" *In re Pattern Energy*, 2021 WL 1812674, at *43 (quoting *Voigt*, 2020 WL 614999, at *13). Standard General retained a firm grip on TPB after the SDI Buyout because it owned 33.5% of TPB.[189] In TPB's latest annual report, it disclosed that, because Standard General funds owned approximately 31.5% of TPB, "Standard General will continue to be able to exert significant influence over our operations and business strategy as well as matters requiring stockholder approval." *See* Turning Points Brands, Inc., Form 10-K, filed February 19, 2021; *see also EZCORP*, 2016 WL 301245, at *36 (holding that the managing director of an entity named "Cash Converters" was not independent because "EZCORP owns approximately 33% of the equity of Cash Converters, giving it substantial influence over that entity"). Standard General's stake thus continued to carry weight,

---

[189] Compl. ¶ 159.

especially because at the time the Complaint was filed, TPB's bylaws still purported to require a 66.6% vote for any amendment to its bylaws.[190] These allegations bear additional significance because Wexler remained TPB's CEO and Zimmerman and Baxter were dual fiduciaries of both SDI and TPB in early July 2020, only four months before the commencement of this litigation on October 9, 2020. At that time, Zimmerman and Baxter voted in favor of the transaction as directors of SDI and separately as directors of TPB. [191]

Based on the particularized allegations of the Complaint, I have a "reasonable doubt" that Zimmerman, Baxter, and Wexler could impartially consider a litigation demand against Standard General. *See Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) (noting that the concept of "reasonable doubt" is "flexible and workable" and permits a plaintiff to control a derivative action "in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms."), *overruled on other grounds*, *Brehm*, 746 A.2d 244; *see also Sanchez*, 124 A.3d at 1023 n.25 (noting that "[a] lack of independence does not turn on whether the interested party can directly fire a director from his day job," but rather depends on

---

[190] Compl. ¶ 160. Defendants argue that supermajority provision in the Company's bylaws was mooted after the Complaint was filed and was never enforceable in any event. Defs.' Opening Br. 37. Regardless of whether the supermajority provision was enforceable, TPB's directors permitted the supermajority provision to remain in effect until after the filing of the Complaint.

[191] Cannataro Aff. Ex. 20 at TPB_Berteau_000284.

if the complaint pleads "facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."). At the time the Complaint was filed, Zimmerman, Baxter, and Wexler were recently subject to control by Standard General, and the four-month period between the SDI Buyout and filing of the Complaint is not long enough to resolve all doubt regarding their independence. *See Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at \*12 (Del. Ch. Dec. 19, 2018) (finding that a director who had served as the company's CEO a few months earlier under the company's previous controller was not independent with respect to that controller, citing the "three-year cooling-off period" provided for in stock exchange guidelines).

Even if Zimmerman, Baxter, and Wexler could be deemed independent for purposes of the demand futility analysis, they face a "substantial likelihood of liability" from the claims asserted in this action because entire fairness applies and because the Complaint pleads facts sufficient to state a non-exculpated claim against them. *Zuckerberg*, 2020 WL 6266162, at \*15. Demand is therefore excused as to them.[192] *See Aronson*, 473 A.2d at 814; *Rales*, 634 A.2d at 930. Because four of seven directors are not independent for purposes of evaluating a litigation demand

---

[192] *See supra* sections II.A.3.i & II.A.3.ii.

and face a "substantial likelihood of liability," there is a reasonable doubt under both *Aronson* and *Rales* that TPB's board of directors could have exercised independent business judgment in considering a litigation demand.

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are denied, except that the Director Defendants' motion to dismiss is granted solely as to Diao, and Count III is dismissed as moot without prejudice to Plaintiff's ability to seek an award of attorney's fees for achieving a corporate benefit.

**IT IS SO ORDERED.**